IN THE MATTER OF THE APPOINTMENT OF A REVISOR OF THE STATUTES.

*February 4, 1910.*

*Constitutional law: Validity of statutes: Practical construction: Division of governmental powers: Appointment to office: Judicial powers: Appointing revisor of statutes: Fixing salaries: Holding of other offices by judges: Trustees of state library.*

1. An act of the legislature is to be sustained if possible by any reasonable construction of the constitution or of the act itself; and all mere doubts as to its validity are to be solved in favor of the act.
2. When the meaning of a constitutional provision is doubtful, long-continued practical construction thereof by the branches of government affected by it is strongly persuasive and often controlling.
3. Each of the three governmental departments, legislative, executive, and judicial, has exclusive functions which no other department can perform; but there are many governmental operations and duties which do not pertain exclusively to any one department and may be performed by inferior officers or agents, in aid of the functions of either.

In re Appointment of Revisor, 141 Wis. 592.

4. Appointment to office is not exclusively an executive function; and when in the execution of their proper duties it becomes necessary or proper for either the legislative or judicial department to have administrative acts performed by assistants, such assistants may properly be selected by the legislature or judiciary, as the case may be, provided the constitution does not otherwise direct.

5. A court or judge may legally be authorized to appoint an officer, even though he be a state officer, where he is to act in an administrative way as an aid, even though indirectly, to the court in the performance of its judicial functions.

6: The duties of the revisor of the statutes under ch. 546, Laws of 1909 (secs. 116, 117, Stats.), are administrative duties in aid of the execution of the purely judicial functions of the supreme court so that the selection of such revisor and his assistants may properly be committed to the judges.

7. The principle that the courts are only to determine what the law has been and is, and not what it is to be in the future, controls a court in the performance of its strictly judicial duties as a decider of controversies, but is not applicable to administrative acts or functions which it is necessary for the court to perform through agents or employees in aid of its purely judicial duties.

8. The fixing of salaries, even in advance, is not exclusively a legislative power, but may be delegated to a court as to officers or agents whom the court is legally authorized to appoint.

9. To constitute an office, as distinguished from a mere employment, the duties must, in general, be shown to be continuous and permanent, not merely transient, occasional, or incidental.

10. The duties imposed upon the justices of the supreme court by ch. 23, Stats. (1898),—which makes them (with the attorney general) *ex officio* trustees of the state law library, and gives such trustees power to appoint a librarian, make rules, purchase books, etc.,—are ministerial or administrative duties which may properly be imposed upon the judiciary, because they are either helpful or necessary in the performance of the purely judicial functions of the court. In performing such duties the justices do not hold a nonjudicial office in violation of sec. 10, art. VII, Const.

11. So, also, as to the duties imposed by ch. 546, Laws of 1909 (secs. 116, 117, Stats.); and the justices are not attempting to hold another office when, acting as such trustees under that statute, they appoint a revisor of the statutes, fix his salary, approve his selection of assistants, etc.

[12. As to the validity of ch. 547, Laws of 1909 (authorizing the trustees of the state library to purchase certain copyrights and

rights to annotations to the statutes), no opinion is intimated by the court.]

SIEBECKER and KERWIN, JJ., dissent as to the validity of ch. 546, Laws of 1909, but accept the opinion of the majority as authoritative for the present purpose and act with other members of the court in executing the provisions of the statute.

TIMLIN, J., dissenting, declines to act under the law.

WINSLOW, C. J.    For about a third of a century the justices of this court and the attorney general have been performing certain supposed duties in connection with the management of the state library at the direction of the legislature. These duties have consisted, among other things, in appointing the librarian and approving his bond, determining the character and number of books to be purchased within the limits of the annual appropriation, approving of the bills for such purchases, and prescribing rules and regulations for the use of the library.

Prior to 1876 the governor, secretary of state, and superintendent of public instruction had charge of the library and were called trustees of the state library, but the power to purchase books and appoint the librarian was in the governor alone.    R. S. 1858, ch. 10, sec. 9; Id. ch. 26, secs. 1, 2.    By ch. 116 of the Laws of 1876 the justices of the supreme court and the attorney general were made ex officio trustees of the library in place of the former officials, and by the Revised Statutes of 1878, sec. 368, they were given the power of appointment of the librarian and the power to approve his bond. The reason for this change in control doubtless lay in the fact that the state library was originally not entirely or even chiefly a law library, but consisted largely of scientific, historical, and purely literary works; but after the library of the State Historical Society had become firmly established it fully occupied the field of general literature, and the state library became solely a law library.    This change had taken place prior to 1876, and hence it doubtless seemed to the legislature as eminently fitting that a library which was almost entirely

used in and about the preparation and decision of lawsuits should be subject to the general supervision of the justices of the supreme court and the highest law officer of the commonwealth. Whether this was the true reason for legislative action or not, the change was made, and during the time that has elapsed since that change, though there have been a number of the state's eminent lawyers upon the bench (and among them one who took a prominent part in framing the constitution), no one of them has ever declined to perform these occasional duties of supervision, or deemed that there was any constitutional objection to the delegation of such duties to them. I speak from knowledge as to the last eighteen years, and from reliable information as to the preceding fifteen years.

In the year 1909 the legislature, becoming convinced that a gradual revision of the statutes under a competent head, who should devote his entire time to the subject, was the true solution of the difficulties arising from the multiplication of laws, passed an act (ch. 546, Laws of 1909) providing for the appointment of a "revisor of the statutes" and prescribing his duties. Doubtless with the idea that this work would be of great assistance to the court and that the justices of this court and the attorney general would or should be exceptionally well informed as to the abilities of possible appointees as well as to the nature of the work to be done, the legislature provided that such officers should make the appointment, fix the appointee's salary (within a certain limit), have the power of removal, and approve the appointment of the revisor's assistants, as well as approve the printing of any compilation of statutes, index, or notes ordered by the legislature. By ch. 547 of the laws of the same year, the same officials were authorized in their discretion to purchase the copyrights of the statutes of the state and annotations thereto, owned by private parties, at prices not exceeding the appropriation carried by the act. These acts did not become effective until late in June, 1909, after

the members of the court had separated, and hence they did not come up for consideration until the fall.

The question whether these last-named laws are constitutional has now been directly raised by Mr. Justice Timlin, and as a result the subject has been taken up and considered by the entire bench, and it has been deemed best, owing to the importance of the question, that an opinion should be written and filed expressing the views of those of the justices who have deemed it their duty to act under at least one of the laws last mentioned.    This opinion is the result of that determination.

The question is to be approached, of course, with the principle in mind that all deference is due to an act of the legislature; that it is to be sustained if possible by any reasonable construction of the constitution or of the act itself; and that all mere doubts as to its constitutionality are to be solved in favor of the act.

That our constitution, like the constitutions of other American commonwealths, recognizes the division of general governmental powers into three distinct parts, viz., legislative, executive, and judicial, and commits each part to a co-ordinate department of the government, is fundamental and undeniable; that it has endeavored to provide effectively against the encroachment of one of these departments upon the proper field of either of the others is equally fundamental and undeniable.    No time will be spent by me either in tracing the history or vindicating the wisdom of this scheme of government; others have written on these subjects more eloquently and convincingly than I could hope to write.

Only the judicial power has been given to the courts of Wisconsin, and the constitution further provides that judges of the supreme and circuit courts "shall hold no office of public trust, except a judicial office," during their terms.    Sec. 10, art. VII, Const.    Both of these courts are purely judicial courts.    *In re North Milwaukee,* 93 Wis. 616, 67 N. W.

1033.   Taking up first the state library law and the revisor law, the questions involved are: (1) Whether these acts attempt to invest the judges with executive or legislative power, and (2) whether, by acting under them, a judge is attempting to hold an office of public trust not judicial.

.It is easy to give general definitions of the three great governmental powers.   The legislative power is the power which makes the laws; the executive, the power which enforces them; and the judicial, the power which expounds and applies them.   Would that it were as easy to apply these general definitions to a concrete case!   It is familiar to all who have considered the subject at all that between these several powers, which seem so distinct in their general character, there are great borderlands of power which may be said to approach nearer and nearer until they merge gradually into each other. In these borderlands it is often difficult to tell where one power ends and the other begins.  · This was not so marked a ·condition in earlier and simpler .conditions of society as it is today.   With the development of the complex conditions of modern civilization there have come governmental necessities undreamed of by our fathers.   Fifty years ago there was no necessity for that new and remarkable governmental agency known as the "commission," while now it fills a wonderful and increasingly important place in our governmental scheme. Though not named in the constitutions and not dreamed of by their makers, the commissions which regulate and control public utilities of the states and the nation are today wielding powers scarce second to the powers of either of the three original departments of the government._  Though they are truly ·executive agencies and have neither legislative nor judicial powers, they are daily doing many· things which vitally affect the life, liberty, and happiness of the people, and in doing these acts they are exercising powers trenching closely on the judicial and the legislative.   In effect they decide real controversies like courts, and they daily coerce vast interests by

regulations which fifty years ago would have been thought to
be nothing short of legislation; yet in the exercise of these
powers they have been almost universally sustained. This
does not mean that the distinction between legislative, execu-
tive, and judicial functions has passed away, or that the con-
stitutional division of powers is worn out, but simply that as
matter of fact it is impossible to say at any given place:
here is a line where legislative power ends and judicial power
begins; all on one side of this line is legislative and all on the
other side is judicial, and no single power can be both. Each
department has exclusive functions which no other depart-
ment can perform, but this does not mean that there may not
be functions common to all the departments. It is the ex-
clusive function of the legislature to make laws, and it is the
exclusive function of the courts to expound the laws; but the
power of neither department is exhausted by the performance
of such exclusive function. There are many other govern-
mental operations and duties not properly to be classified
under either head, nor exclusively executive in their charac-
ter, and which may be performed by inferior officers or agents
in aid of the functions of either great department.

Appointment to office, while generally called an executive
function, cannot under our constitution be classed as exclu-
sively a function of either of the three great departments.
Indeed, as matter of fact, the constitution reserves the power
in large degree to the people themselves. Sec. 9, art. XIII,
Const. It is frequently spoken of as typically an executive
power; but when in the execution of their proper duties it be-
comes necessary or proper for either the legislative or judicial
department of the government to have administrative acts per-
formed by assistants, such assistants may properly be selected
by the legislature or judiciary, as the case may be, provided
the constitution does not otherwise direct. This must be held
to be settled in this state by the case of *State ex rel. Gubbins v.
Anson,* 132 Wis. 461, 112 N. W. 475, where the power given

to circuit judges to appoint jury commissioners was upheld after very thorough consideration by this court, a trifle more than two years since.  It is to be observed in this case also that the jury commissioners were held to be officers either of the state or the judicial circuit, and not mere employees of the state.  So we have the initial proposition settled, to wit, that a court or judge may be legally authorized to appoint an officer, even though he be a state officer, in cases where the duties of the officer are to assist the court in the performance of acts of an administrative character, necessary or proper to the due discharge of judicial duties.

But our court has certainly gone further than this.  The power given to the circuit judge to appoint commissioners to equalize county valuations of property for taxation and audit their bills for services and expenses (sec. 1077$a$, Stats. 1898) would not seem to come within the category of powers necessary or even convenient for a court to have in order to perform its constitutional duties, yet this law has been repeatedly sustained.  In the early cases there was no mention of the particular objection now under consideration, but finally in *Foster v. Rowe,* 128 Wis. 326, 107 N. W. 635, the claim that it was a nonjudicial duty was fully argued, and this court expressly overruled it and held the legislation valid, apparently on the ground that the commissioners were only a temporary tribunal to perform certain *quasi*-judicial duties in taxation proceedings.  In making this decision not only were the former Wisconsin cases cited in which the law had been sustained against attack on other grounds, but reference was made to adjudged cases from the states of Colorado, Georgia, New Jersey, and Ohio, in which cases respectively it was held that courts might properly be authorized to appoint the following officers, viz.: (1) Commissioners to call and conduct an election to determine the question of incorporation or not; (2) a board of commissioners for the registration of voters and management of elections generally; (3) commissioners

to lay out public parks in cities; and (4) trustees to build and operate a commercial railway to be built by the city of Cincinnati. Reference was also there made to the text on page 1060 of 6 Am. & Eng. Ency. of Law (2d ed.), where it is said that though there is a division of authority on the question whether the exercise of the appointing power by the judiciary is an infringement of the constitutional separation of governmental functions, a majority of the courts which have passed on the question have sustained the power, and that so far as the question relates to ministerial officers and assistants of courts the power of appointment seems to have been exercised without question where it was properly conferred. See, also, 23 Cyc. 538, 539, where the validity of laws authorizing judges to do very many ministerial acts, including appointments to office, is fully sustained.

Again, the various laws, commencing with ch. 442, Laws of 1885, authorizing circuit courts and judges to organize drainage districts on petition and appoint drainage commissioners to carry out extensive systems of drainage of swamp lands by levying special assessments, have been sustained by this court against vigorous and able attacks, although the exact point now under consideration seems not to have been discussed. *Bryant v. Robbins*, 70 Wis. 258, 35 N. W. 545; *State ex rel. Baltzell v. Stewart*, 74 Wis. 620, 43 N. W. 947; *Muskego v. Drainage Comm'rs*, 78 Wis. 40, 47 N. W. 11. The general law, however, authorizing the formation of such districts and the appointment of commissioners in the same way (sec. 1379—11 *et seq.*, Stats. 1898) was vigorously attacked in the case of *Stone v. Little Yellow D. Dist.* 118 Wis. 388, 95 N. W. 405, as not a judicial proceeding, and after full argument the validity of the statute was sustained. Under this general law it is to be noted that the drainage commissioners appointed by the court or judge are required to take the constitutional oath of office and give a bond, and that they have a definite term which is called their term of office. In a num-

ber of the drainage laws just mentioned the court or judge is authorized to audit the bills of the commissioners before they can be paid.

In view of these decisions it must be conceded, I think, in considering what duties may properly be delegated to courts, that this court has already taken a view which would seem to entirely justify the conclusion; without further examination, that the power to appoint a revisor and his assistants is one which may properly be conferred on the judiciary. However, I desire to give the subject a much fuller examination, and in doing so I wish first to inquire whether it can be fairly held that the duties of the revisor and his assistants are in fact administrative duties, in aid of the execution of the purely judicial functions of this court, so that the selection of such revisor and his assistants may properly be committed to the judges under the principle laid down in the *Anson Case,* before cited. This court is the final judge of the meaning, application, and validity of the statute law of the state. In this latter day, when statutes upon innumerable subjects are multiplying as never before, when new fields of legislative activity are necessarily being opened every year, it is no easy task to follow the course of legislation and be sure that one has seen all the laws on a given subject, or knows just which laws are in force and which have been repealed. Especially is this true as the period following a general revision grows longer. The writer speaks from experience when he says that there have been many times when he would have given much to be able to go to a card index or loose-leaf statute which would inform him at once of the condition of the statute law on a given subject, or give him notes of all the decisions under a section up to date. Now it is to be noted that under the law in question these very things are provided for and seem to form as important a part of the law's purpose as ultimate revision of the statutes. The revisor is required to keep not only a loose-leaf set of the statutes and a card in-

dex thereof, but a loose-leaf ledger of the decisions on the various sections, properly arranged, as well as a loose-leaf set of repealed or superseded provisions, with notes of decisions and a card index thereof.   These requirements, if properly carried out, will place in the law library, open to the use of the court and of attorneys, the means of rapid and reliable ascertainment of the condition of the statute law and the decisions thereon, so that the information which now requires hours of research may be obtained in a few minutes. To say that such books and indexes will be of substantial help to this court in the transaction of its great volume of business would be to state a truth which must be obvious.   Not only this, but the gradual revision of the statutes itself will be of great assistance to the court in its duties.   The attempt to patch onto the Statutes of 1898 the great volume of legislation which has been passed since that time has resulted in a very mountain of confused, involved, and contradictory statute law, which is not only difficult to be understood by the citizen and lawyer, but by the court as well.   A thorough and concise revision would not only reduce this confused mass of law to reasonable limits, but also make it far more intelligible and certain in its application, and thus conduce to the more rapid and satisfactory performance of the duties of this court.

If these considerations do not demonstrate that within the prior decisions of this court the appointment of a revisor of the statutes should logically be held a duty which the legislature may rightfully commit to the judiciary, they seem certainly sufficient to leave the question doubtful; and if it be doubtful, then the inquiry whether there has been any long-continued, practical construction of the constitutional provision by the branches of the government affected thereby is not only proper but essential.   Lawbreaking is none the less lawbreaking because it is grayheaded with age; but when the meaning of a doubtful clause is in question, the construction placed upon it by the fathers, and concurred in through long years.

without question, is strongly persuasive and frequently will be held to be controlling.  *State ex rel. Bashford v. Frear,* 138 Wis. 536, 120 N. W. 216.   When I began the investigation of this subject historically I knew there were a number of precedents, but I had no idea of the number of them.   For nearly thirty-five years the legislature has been committing appointments of this nature to the judges of this court or of the circuit court with power to fix compensation, and the judges have been performing the duties, the auditing department has been auditing the bills allowed, and the financial agents of the government have been paying them.

The first significant law of this nature is ch. 203 of the Laws of 1875, which authorized the justices of this court to appoint three competent persons to collect and revise the general laws of the state.   This act provided that the revisers should receive such compensation for their services and for clerk hire as the justices of the court should deem just and reasonable, to be audited by the secretary of state upon the allowance of the justices.   The act also authorized the justices to appoint other persons to fill vacancies in the board if necessary, and directed that they should first approve any printing ordered by the revisers.   It will be seen that the act, while brief, covered all the essential features of the act now under consideration, except that the revisers were not to serve for any definite term nor was it specified that their compensation should be fixed in advance or called salary.

At the time this law was passed there were two constitution makers on this bench.   Judge COLE had taken a conspicuous part in framing the constitution under which we live, and Judge RYAN had taken an even more conspicuous part in the convention which framed the rejected constitution two years earlier, which constitution contained the same general provision that judges should hold no other office, in nearly the same words.   Judge LYON, their colleague, had been speaker of the assembly in 1859, and had almost literally sat at the

feet of Gamaliel, so far as the constitutional history of the state was concerned. The question whether they should act under such a law was then a new one. It is inconceivable that they should have acted without considering whether the law was valid, and it is equally inconceivable that they could have acted unless they had decided in favor of its validity.

Reference to the records of the office of the secretary of state shows that on March 26, 1875, the justices sent a communication to that office in which they certify that "We, the justices of the supreme court, have this day appointed" David Taylor, William F. Vilas, and J. P. C. Cottrill as revisers under the law named. This order was signed by all of the justices named. It is well known that the work proceeded under this order and that the final result was the Revised Statutes of 1878. Before that consummation, however, the legislature and the court had taken further and even more significant action. It was feared that the work could not be accomplished so as to be ready for the legislature of 1878, and so ch. 298 of the Laws of 1877 was passed authorizing *the court* (if necessary in the opinion of the majority of the justices) to appoint not more than two additional members of the board of revisers and assign them their duties, and appropriating such sum as *the court* should deem a reasonable compensation for their services. It is to be noted that neither in this act nor the preceding one was any limitation placed upon the amount to be spent; the confidence of the legislature was evidently unbounded. It is further to be remarked that in the last act the power of appointment and allowance was vested in *the court* itself rather than in the justices.

Reference to the record again shows that *the court* acted in response to the last-named law, and by an order entered on the court minutes appointed J. H. Carpenter and Harlow S. Orton as additional revisers, giving them each a specific portion of the statutes as a field of labor and fixing the compensation of each in advance at $15 per day. If there were

doubt as to the conclusion reached by the justices on the question of the judicial character of this work after the making of the order appointing the first board, that doubt would certainly be removed by the action taken under the second law, where *the court* not only made the appointments, but fixed the compensation in advance.   But this was not all.   By ch. 3 of the Laws of 1878, passed at the extra session, the legislature directed the printing and publication of the new revision to be done under the supervision of two persons whom the justices of the supreme court should appoint, whose compensation, clerk hire, and necessary expenses should be fixed and allowed by the justices.   Under this law the justices (then being five in number by the addition of Justices TAYLOR and ORTON) made and signed an order on June 21, 1878, appointing Wm. F. Vilas and J. H. Carpenter to act under the law, and fixed the pay of each at the sum of $400 per month during the time of their service.   By this order they also named a standard volume in accordance with which the work was to be compared and executed, as provided by the act.   It seems that it would be hard indeed to find words and acts which would more completely prove that both the legislature and the court then regarded the work of preparing and printing a revision of the statutes as work which was so far judicial in its nature that not only the work itself, but the amount of compensation of the actual workmen, either in advance or otherwise, might properly be committed to the justices of the court and even to the court itself.

The laws of the same general character which have followed this law will now be named, and their general features given, without however going so greatly into detail.   By ch. 116 of the Laws of 1876 the law library was placed in the hands of the justices and the attorney general, under the name of trustees of the library, and the duties of selecting the books to be purchased, as well as the rules to be observed in their use, committed to them.   By sec. 368 of the Revised Statutes of

1878 the same officials, under the name of trustees, were given power to appoint and remove the librarian, approve his bond, and certify to the prices of the books purchased. All of these duties have been discharged from time to time without question as to their legality, from that time until the present.

By ch. 252 of the Laws of 1882 the justices were authorized to appoint two members of a board of commissioners who superintended the construction of the new wings to the old capitol. As one of these wings was to contain the court and library it was evidently deemed fitting that the court should have some representatives on the board. By ch. 63 of the Laws of 1885 the court was authorized to appoint commissioners to examine applicants for admission to the bar and to fix and allow their compensation, not exceeding a certain amount *per diem,* as well as their necessary expenses. This law has been acted on ever since that day and is still in active and successful operation.

By ch. 389 of the Laws of 1887 the legislature made another very significant delegation of the appointing power. By this chapter the justices were authorized to appoint three persons, one of whom was to be the attorney general, to draft a general charter law for cities, and to fix their compensation not exceeding a certain sum, as well as approve the printing required by the commissioners. Here again was a recognition of the fact that codification of the statutes, even of a small portion thereof, was considered within the judicial field and hence properly a subject of action by the judiciary. The justices promptly acted on this law, and the work was done and resulted in the general charter law which, with amendments, is still upon our statute books. The pay of these commissioners, within the modest maximum fixed by the legislature, was allowed by the justices of this court, as Mr. Justice MARSHALL, who was on that commission, can personally testify.

Again, by ch. 379 of the Laws of 1897 two of the justices were required to examine the new revision, then nearing com-

pletion, and certify that the provisions of the acts authorizing
the revision had been complied with before its publication,
and this duty was performed, as appears from the published
certificate at the end of the revision of 1898.

By ch. 435 of the Laws of 1903 *this court* was authorized
to appoint a board of five commissioners to redistrict the ju-
dicial circuits of the state and file their report with the clerk
of this court.    That commission was appointed by *this court*
July 3, 1903, Mr. John B. Simmons, of Racine, being chair-
man, and made and filed their report with a proposed bill,
which report and bill were sent by the clerk to the legislature
of 1905.    The bill, however, was not passed.

In the year 1903, the accommodations of the supreme court
and the library having become much too small and congested
for the volume of business transacted by the court, the legis-
lature, by ch. 399 of the laws of that year, authorized the
justices to nominate, and the governor to appoint, one of their
own number as a member of a commission to obtain and adopt
a plan for additions to and changes in the capitol, in order to
properly accommodate the law library and the court.    The
writer was nominated and appointed under this law, and the
governor also appointed Mr. Justice MARSHALL on the board.
Both acted, and did so upon the basis that they were perform-
ing simply a temporary duty, vitally connected with the
proper transaction of the duties of the court, and hence proper
for a justice of this court to perform, and were not accepting
another office.

By a number of laws passed at various times the justices
have been authorized by the legislature to appoint the supreme
court reporter, also to appoint and fix the compensation of a
proofreader and other help in the reporter's office, also sten-
ographers and copyists to assist the justices personally.    By
other acts the trustees of the library have been authorized to
appoint and fix the salaries of an assistant librarian and other
necessary clerical help in the librarian's office, also the addi-
tional help necessary to install a card index in the library, and

all of these provisions have been acted on, and are being acted on today.   See the following laws: Secs. 346, 346a, S. & B. Ann. Stats. (1889) ; ch. 187, Laws of 1895 ; ch. 245, Laws of 1897; ch. 328, Laws of 1899; ch. 466, Laws of 1907; and ch. 206, Laws of 1909.

By ch. 323 of the Laws of 1909 the circuit judge is authorized to appoint and remove at pleasure in each county "divorce counsel," who is required to take the constitutional oath of office, and seems to approach very closely to the position of a county officer.

Doubtless other laws could be cited along the same general lines—my own examination necessarily has been somewhat hurried,—but enough have been cited to show that for nearly thirty-five years all departments of the government, executive, legislative, and judicial, have persistently and continuously construed as valid laws substantially similar to the revisor law.

I note the objection that the state library law endows the justices with another public office not judicial, namely, that of trustees of the state library, in violation of the constitution, which says that they shall hold no office of public trust during their term except a judicial office.   There have been many attempts to accurately define an office and differentiate it from a mere employment, but it is manifest that the line is not easy to draw.   In *Hall v. State*, 39 Wis. 79, Justice Lyon said:

"When public functions are conferred by law upon certain persons elected by the people or appointed by the legislature, if those functions concern the general interests of the state, and are not of a nature merely local or temporary, such persons are public officers, especially if they are paid a salary for their services out of the public treasury."

The doctrine is well-nigh universal that the duties must be continuous and permanent, and not merely transient, occasional, or incidental.   *State ex rel. Brown Co. v. Myers*, 52

Wis. 628, 9 N. W. 777; *U. S. v. Germaine,* 99 U. S. 508; *State ex rel. Lewis v. Board of Pub. Works,* 51 N. J. Law, 240, 17 Atl. 112; 6 Words & Phrases, 4925, 4927; *U. S. v. Hartwell,* 73 U. S. 385.

. With these principles in mind let us consider the nature of the duties of the trustees and the evident intent of the legislature. *First,* it is to be noted that they are not expected or required to take any oath of office. They become trustees by virtue of their official character as justices, and remain trustees only during their incumbency. The constitution (sec. 28, art. IV) requires all officers to take the constitutional oath of office unless by law exempted. *Second,* their duties are only occasional and temporary. The appointment of a librarian or an assistant, the promulgation of rules, and the determination as to the books to be purchased, and approval of occasional bills comprise the duties; and it must be apparent to any one that weeks and months must frequently elapse between the occasions when any of these acts are to be performed. If the legislature had said that the justices of the supreme court should have power to appoint a librarian and his assistant when necessary, and that they should from time to time determine the number of books to be purchased and fix their prices, there would be no claim, I apprehend, that the legislature had attempted to confer upon the justices another office, but at the most a claim that the duties were not judicial in their character. The law in question adds nothing to the supposed situation except that it calls them "trustees." This is significant, perhaps, but not conclusive. The inference is persuasive, I think, from the whole tenor of the act, that the appellation "trustees" was inserted as matter of convenience and to avoid the frequent repetition of the titles of the officials. This becomes rather more apparent when the original act creating the library (ch. 352, Laws of 1851) is considered. By this act the governor, secretary of state, and superintendent of public instruction were made *ex officio*

trustees. This act was entitled "An act to provide for the superintendence of the state library, for the purchase of books for the same and for other purposes." Practically all that the trustees were authorized to do was to make rules for the superintendence and care of the library, fix the salary of the librarian, and report to the next legislature the books in it. The governor was given the power to appoint the librarian and purchase all the books. It would seem almost farcical to call this original trusteeship an office; it is plainly nothing more than an imposition of an occasional and merely temporary duty on officials already existing. The present law has simply grown out of that original law, the justices and the attorney general being substituted as trustees in 1876. But while the occasional duties of the "trustees" have been somewhat increased there has been no indication that these duties were supposed to constitute them officers any more than the original trustees. The trustees have never received salary or compensation of any kind, and their legal right to act in this capacity was recognized by way of argument and illustration in *State ex rel. Gubbins v. Anson,* 132 Wis. 461, 112 N. W. 475, where it was said that it rested upon the same principle which justified legislation giving courts and judges the power to select necessary assistants. Viewing the law as it stands, and its long history, the utmost that could be said, were the question new, is that it is a matter of doubt whether an office was intended to be created or not. If this be the correct view, then it seems to me unquestionable that the doubt has been set at rest long ago by the construction placed upon the law continuously since 1876 to the present moment—a construction which commenced when two constitution makers, revered for their learning and probity, were still upon the bench. If I err in my conclusions, I am content to err in such reverend company as this.

I note another objection to the law, to the effect that the fixing of salaries is exclusively a legislative power which

cannot be delegated to a court. Two cases are referred to as sustaining this position, viz.: *Smith v. Strother,* 68 Cal. 194, 8 Pac. 852, and *Madison v. Madison G. & E. Co.* 129 Wis. 249, 108 N. W. 65. The first of these cases explicitly lays down the proposition that the fixing of the salary of even a court reporter, in advance, is a legislative act which cannot be delegated to a court. The decision is based simply on the well-understood rule that a judicial act determines what the law is and the rights of the parties are as to past transactions; a legislative act provides what the law shall be in future cases arising under it. The second of the cases cited holds that the fixing of rates to be charged by public utilities in the future is a legislative, not a judicial, act, and cannot be done by a court. This holding is based upon the principle that to prescribe rules for the future is a legislative act, but to inquire whether legal rules have been violated in the past is a judicial act. There is no quarrel with this abstract proposition. It is frequently stated in these or similar terms and is a correct general statement. It does not mean, however, that a court or judge can never do anything except decide whether the law has been violated in the past, nor that a legislature must spend all its time passing laws for the future. If the proposition included everything that a court or judge could do, then it would be impossible for a court to appoint a bailiff to keep order, or make rules for the conduct of business. As we have already seen, a court may properly be given power to provide for the doing of such administrative acts as are necessary and proper to enable it to satisfactorily perform its purely judicial duties, and may, under legislative sanction, appoint necessary or proper officers and agents for those purposes. *State ex rel. Gubbins v. Anson, supra.* Now, if this be conceded, it seems illogical to say that the power to fix compensation or salary in advance may not accompany the power of appointment. The power of appointment is doubtless given because it is deemed that it will be best exercised by the court, since

the duties affect the conduct of judicial business, and the judges may be supposed to have better knowledge of the qualifications of possible appointees. But if not accompanied with the power to fix a salary in advance, it might well be that the purposes of the law would be defeated, either because the desired appointee would not accept the compensation fixed by the legislature, if one be fixed, or would be unwilling to work without knowing in advance what he was to receive. With all due respect to the supreme court of California, it seems clear that in *Smith v. Strother, supra,* that court misinterpreted and misapplied a correct general principle. The principle that courts are only to determine what the law has been and is, and not what it is to be in the future, controls a court in the performance of its strictly judicial duties as a decider of controversies; but it is manifestly illogical, as it seems, to apply it to administrative acts or functions which it is necessary for the court to perform through agents or employees, in aid of its purely judicial duties. I say illogical, because if the rule does apply to these last-named functions, then no court or judge could give any directions to the clerk, or stenographer, or bailiff, or other employee, as to his duties or conduct in the future, but must be confined to reprimand and punishment for past acts, in the hope that ultimately and through much tribulation the employee will learn his duties. If the court may not be authorized to fix the pay in the future it would logically follow that it may not be authorized to fix the duty in the future. Both acts offend against the principle that the court must simply apply the law to past acts, if either does.

But we are not without authority in this matter. This court has decided the question in the learned and eloquent opinion written by Chief Justice DIXON, just before he left this bench, in vindication of the power and right of the court to have a bailiff of its own choosing, rather than an employee sent here by the executive department. In this case not only was the inherent power of the court to appoint its bailiff de-

clared (reaffirmed in *Stevenson v. Milwaukee Co.* 140 Wis.
14, 121 N. W. 654), but it was distinctly determined that
his pay in the *future* was to remain the same as in the past,
and further it was rather defiantly stated that if the legisla-
tive branch of the government neglected to make the necessary
appropriation for the bailiff's salary he would have his action
therefor against the state. *In re Janitor of Supreme Court,*
35 Wis. 410. By virtue of that judgment, the respected
and faithful officer of the court, named in that opinion, has
retained his position and rendered valuable service to the
state from that day to the present. Here was a fixing of sal-
ary in the future, not only when the legislature had author-
ized it, but even when the legislature had not acted. Of
course the court could only fix a salary of its own motion
when the officer is an absolutely necessary one, whom the court
has inherent power to appoint and where the legislature has
failed to fix his pay (*Stevenson v. Milwaukee Co., supra*);
but the case is a clear adjudication that the power to fix the
salary of an inferior court assistant is not purely legislative.
If the court can fix in advance the salary of one adminis-
trative employee it may certainly be authorized by the legis-
lature to fix in advance the salaries of others. The fact that
one is an absolutely necessary employee and the others are
merely helpful assistants, created by legislative will, cannot
make any difference with the quality of the act of fixing a
salary in advance.

We have already seen that in 1877 *this court,* by order en-
tered on the minutes, appointed two additional revisers and
fixed the pay of each in advance at $15 per day, while in 1878
the justices appointed two superintendents of printing and
fixed their pay in advance at $400 per month. At least twice,
therefore, the court has formally spoken on this matter; and
following these precedents, the justices, either acting individ-
ually or together, have fixed salaries of employees of the court
and library on very many occasions. In Kentucky it has
been held that the power to fix the salaries of county officers

in advance may properly be conferred upon courts. *Stone v. Wilson,* 39 S. W. 49, 19 Ky. Law Rep. 126. The same doctrine is laid down in Minnesota with reference to the county attorney, because he might properly be considered as a *quasi*-officer of the court. *Rockwell v. Fillmore Co.* 47 Minn. 219, 49 N. W. 690. So far as Wisconsin is concerned, the question of the power of the legislature to delegate to courts or judges the right to appoint assistants and other officers to perform acts of an administrative character in aid of the court's judicial functions, and to fix the salary of such assistants or officers, seems settled both by direct decision and by long-continued practical construction. It seems hardly necessary to look for outside authority on the subject, yet it is interesting to take a glance afield and see what has been held in other jurisdictions.

It is believed that all of the state constitutions divide the powers of government into the three great departments, and many, if not most, of them contain a provision inhibiting judges from holding any other office. It would naturally be expected that the question of the validity of laws delegating the appointing power to courts and judges must frequently have arisen, and such in fact is the case. In an extensive note to our own case of *Foster v. Rowe,* 128 Wis. 326, 107 N. W. 635, reported in 8 Am. & Eng. Ann. Cas. 595, the authorities are collated practically up to the present time. From this note it appears that such laws have been held valid in the states of Alabama, California, Colorado, Georgia, Illinois, Indiana, Kentucky, New Jersey, New York, Oregon, Pennsylvania, Texas, West Virginia, and Wisconsin, besides which the same holding has been made in some of the lower federal courts. While the note cites very many cases supporting this doctrine, I will content myself here with simply citing one case from each of the states named, viz.: *Fox v. McDonald,* 101 Ala. 51, 13 South. 416; *Staude v. Board of Election Comm'rs,* 61 Cal. 313; *People ex rel. Rhodes v. Fleming,* 10 Colo. 553, 16 Pac. 298; *Russell v. Cooley,* 69 Ga. 215;

*People ex rel. Longenecker v. Nelson,* 133 Ill. 565, 27 N. E.. 217; *Terre Haute v. Evansville & T. H. R. Co.* 149 Ind. 174, 46 N. E. 77; *McArthur v. Nelson,* 81 Ky. 67; *Ross v. Essex Co.* 69 N. J. Law, 291, 55 Atl. 310; *Allison v. Welde,* 172 N. Y. 421, 65 N. E. 263; *Walker v. Cincinnati,* 21 Ohio St. 14; *State ex rel. v. George,* 22 Oreg. 142, 29 Pac. 356; *Comm. ex rel. v. Collier,* 213 Pa. St. 138, 62 Atl. 567; *State ex rel. v. Manlove,* 33 Tex. 798; *State v. Mounts,* 36 W. Va. 179, 14 S. E. 407.

Some of the numerous cases cited in the note go upon the exact ground stated in the *Anson Case,* namely, that the appointees are assistants or employees of the court; some upon the ground that the duties to be performed were of a judicial nature in themselves, such as the duties of election commissioners, who hear evidence and decide whether the judges of election have improperly refused registration to voters, or the duties of commissioners to settle matters of indebtedness between counties; but a third and large class go upon the broad ground that the power of appointment to office does not necessarily or ordinarily belong to either the legislative, executive, or judicial department alone, but that in the absence of constitutional inhibition it may be exercised by the people or by the legislature or committed by the legislature to the executive or judicial department, or even to third persons with no official position, and that it is an executive function when committed to the executive, legislative when committed to the legislature, and judicial when committed to the judiciary. This latter doctrine is stated as the law in a very long and learned note to the case of *People ex rel. Waterman v. Freeman,* 80 Cal. 233, 22 Pac. 173, reported in 13 Am. St. Rep. 122, and is thus clearly stated in *Ross v. Essex Co.* 69 N. J. Law, 291, 55 Atl. 310:

"An examination of our constitutional and legislative history will dissipate the idea that the power of appointing to office is the peculiar property of any one of the three departments of our government."

It is further stated in the first note above referred to that in the following states such statutes have been held unconstitutional, viz.: Iowa, Maryland, Michigan, Massachusetts, and Minnesota, and possibly one or two others. In Iowa the officers were municipal waterworks trustees (*State ex rel. White v. Barker,* 116 Iowa, 96, 89 N. W. 204); in Maryland jail visitors (*Beasley v. Ridout,* 94 Md. 641, 52 Atl. 61); in Michigan surveyors for locating and building drains (*Houseman v. Montgomery,* 58 Mich. 364, 25 N. W. 369); in Massachusetts supervisors of election (*Case of Supervisors of Election,* 114 Mass. 247); in Minnesota members of a local board of county control (*State ex rel. Young v. Brill,* 100 Minn. 499, 111 N. W. 294, 639). But in Massachusetts the power to appoint commissioners to assess benefits and damages in laying out highways has been held proper to be given to a court because they have judicial functions (*Salem T. P. & C. B. Co. v. Essex Co.* 100 Mass. 282); and in Minnesota the power to appoint title examiners under the Torrens system was held properly given to the court on the ground that the examiners are assistants of the court (*State ex rel. Douglas v. Westfall,* 85 Minn. 437, 89 N. W. 175). Thus these two states appear to be in harmony with the *Foster* and *Anson Cases;* and in Iowa it is expressly recognized that if the power to be exercised is judicial in its character or in aid of judicial functions, it is proper to delegate the appointment of an officer to exercise the power to a court. *State v. Barker, supra.*

It is not to be understood, by reason of the omnibus citation of the authorities marshaled in the note to *Foster v. Rowe,* that they are all approved. Especially is it not to be understood that the cases holding the broad doctrine that any appointment of any kind which is authorized by the legislature may be vested in a court. It is not necessary to go further, and we do not go further, than was gone in the *Anson Case,* namely, to hold that where the officer or employee is to act in an administrative way as an aid, even though indirectly, to

the court in the performance of its functions, his appointment may rightly be delegated to a court or judge, and such delegation is not an invasion of executive power; nor is the fixing of his salary in advance an invasion of legislative power; nor does the judge who makes the appointment thereby attempt to hold another office. We cite the note and the authorities under it, however, as evidence of the apparently great preponderance of authority not only in favor of the validity of such legislation as is before us, but of legislation which goes much farther and authorizes courts to appoint such officers as election commissioners, police commissioners, park commissioners, trustees for the construction of a subsidized railroad, tax collectors, school commissioners, bridge commissioners, commissioners to borrow money and sell bonds, and numerous other officials and agents who neither aid the court in its duties nor act judicially.

Recurring for a moment to the question of the legal propriety of the justices of this court acting as so-called trustees of the law library, it is noted that in California, under a constitution forbidding the exercise by the judiciary of powers belonging to other departments, it has been held that a statute making the chief justice *ex officio* a member of the library board was invalid because the powers were strictly executive and not judicial. *People ex rel. Simmons v. Sanderson,* 30 Cal. 160. Whether the library was miscellaneous or legal does not appear from the report of the case and the reasoning of the case is not persuasive. It is further to be noted that in the state of Nebraska since 1871 the judges of the supreme court constitute the board of directors of the state law library, with power to make rules for its use and direct the purchase of books, and that the *supreme court* is authorized to appoint the librarian. Cobbey's Ann. Stats. 1903, §§ 586, 7052–7060. This law seems never to have been questioned, and it is deemed likely that investigation would show that other states have adopted the same plan.

The result reached is that the duties imposed by ch. 23, Stats. (1898), with reference to the state library, as well as the duties imposed by ch. 546 of the Laws of 1909 (secs. 116, 117, Stats.), with reference to the appointment of a revisor, etc., must be considered as ministerial or administrative duties, which may properly be imposed upon the judiciary because they are either helpful or necessary in the performance of the purely judicial duties of the court.

As to the purchase of copyrights under ch. 547, Laws of 1909, no decision has yet been reached. When it becomes necessary to decide whether the judges may properly be required to act as purchasing or business agents of the state and to spend a relatively large fund in buying property, and thus make contracts out of which litigation may easily arise, the question will be given that serious attention which it deserves, and until that time no opinion thereon is intimated.

I do not think that any of the justices of this court are greedy for power, least of all for the appointing power; and the writer speaks from personal knowledge when he says that he does not desire to assume labors in addition to the ordinary duties devolving on a justice of this court in the hearing and determination of actions at law. In these latter labors he finds opportunity to give all his powers full exercise, and he has not been conscious of any yearning for other worlds to conquer. He desires, however, as he believes all his colleagues desire, to discharge in full measure the duty which is owing by a justice of this court to the people of the state by virtue of his election to an important office and by virtue of the obligations of his oath of office. He would break that oath just as culpably by refusing to perform a duty which his judgment tells him is legally imposed on him as by performing an act which he deems that the constitution forbids him to perform.

I am authorized to state that Justices MARSHALL, DODGE, and BARNES concur in the conclusions reached in this opinion.

SIEBECKER, J. (*dissenting*).   Ch. 546 of the Laws of 1909,
creates and adds two new sections (secs. 116 and 117) to the
statutes of the state.   The title declares that it is an act "re-
lating to the revision of the statutes, and making an appro-
priation."   It provides for the appointment of a revisor
of the statutes, to be known as "revisor," and that his appoint-
ment shall be made by the trustees of the state library "upon
the passage of this act, and thereafter on and after the third
Wednesday in January of each year in which the legislature
shall meet in regular session."   When the justices undertook
compliance with this law I participated in their action, and
I did not examine into the validity of the law until the ques-
tion was raised by one of the justices.   In my opinion this
challenge to the validity of the legislation raises the question
of its constitutionality and presents to the members of this
court the twofold inquiry: Is this law constitutional, and, if
it be valid legislation, are the justices of this court obligated
to perform the duties imposed by the law?

    The chief justice, in an exhaustive and comprehensive opin-
ion, has collated the different legislative acts, from the time of
the adoption of the state constitution to this day, whereby
various duties have been imposed on the justices of this court
by the legislature, and has collected the decisions of this court
bearing on the subject.   I am in accord with the view ex-
pressed therein to the effect that our constitution manifestly
recognizes the doctrine of the division and separation of gov-
ernmental powers into legislative, executive, and judicial de-
partments; that their execution is lodged in these co-ordinate
departments of the government, which are independent each
of the other in executing their respective powers; and that
neither can assume to encroach upon the field of another with-
out invading this fundamental doctrine of the separation of
these sovereign powers.   I also concur in the principle that
"when in the execution of their proper duties it becomes neces-
sary or proper for either the legislative or judicial depart-

ment of the government to have administrative acts per-
formed by assistants, such assistants may properly be selected
by the legislature or the judiciary, as the case may be, pro-
vided the constitution does not otherwise direct." This is
the effect of the decisions of this court in *In re Janitor of
Supreme Court*, 35 Wis. 410, and *State ex rel. Gubbins v.
Anson*, 132 Wis. 461, 112 N. W. 475. It is within this prin-
ciple that the duties prescribed by secs. 367 to 372, Stats.
(1898), inclusive, appertaining to the management of the
state library, and the duties imposed by sec. 346, Stats.
(1898), respecting the appointment of a reporter for editing
the decisions of this court, are properly imposed on the jus-
tices of the supreme court in their official capacity. So far
as the administration of the affairs of the state library and
the appointment of a librarian and of a person to report and
publish the decisions and opinions of this court, as well as the
appointment of their assistants and other helpers for the per-
formance of these acts, are committed to the justices by these
statutes, it seems clear to me that the law makes them the
agencies of the state for the proper execution of the duties de-
volving on the judicial department of the state, and that it
calls on them to perform administrative acts which are neces-
sarily connected with the administration of the state's judicial
affairs. The incumbents of these positions, thus selected by
the justices, are in my opinion performing ministerial func-
tions as assistants of the court, and the power of appointing
them is a duty properly lodged in the judicial department of
the government. The acts heretofore performed in execution
of these statutes by the trustees or by the president and secre-
tary of the board at the direction and command of the mem-
bers, I regard as fully justified and as fully within the scope
of the judicial branch of the government, though the legisla-
ture has by statute created the occasion calling for their per-
formance.

I am unable to concur in the opinion of the justices as ex-

pressed in the opinion of the chief justice that the revisor to be appointed under ch. 546 of the Laws of 1909 is an administrative officer engaged in the performance of acts connected with the judicial department of the state government. The act provides that the revisor shall prepare a loose-leaf set of the statutes in force, arranged in sections, that he shall designate the titles and subtitles under which they are indexed, and that he shall keep an appropriate card index thereof; that he shall keep and maintain notes of court decisions referring to the statutes; that he shall supervise a compilation of such statutes, subject to the trustees' approval, and attend to the printing thereof and of such portions as may be ordered for the use of any department of the state; that he shall prepare and keep a loose-leaf record of laws which have been repealed, amended, or superseded by subsequent enactments; and that he shall keep these records in duplicate in the state library. This chapter also makes it the duty of the revisor:

"To formulate and prepare a definite plan for the order, classification, arrangement, printing, and binding of the statutes and session laws, and between and during sessions of the legislature to prepare and at the beginning of each session of the legislature to present to the committee on revision of each ' house, in such bill or bills as may be thought best, such consolidation, revision, and other matter relating to the statutes or any portion thereof as can be completed from time to time."

I am unable to discover that any of these acts are administrative acts connected with the execution of the judicial power of the state. From their very nature it is manifest that these services pertain to and are part of the execution and administration of the legislative branch of the government. True, when the revisor's duties have been performed, the result may be materially adapted to aiding the court in performing its duties; but I perceive no difference in the product of his work and the same thing done by a legislative committee respecting the compilation, codification, and annotation of laws and their

publication in convenient and serviceable form, which I take it could not in any sense be regarded as connected with the administrative functions of the judicial department. They are obviously administrative acts connected with the execution of functions pertaining to the legislative branch of the government. I consider, therefore, that the duties imposed on the revisor by ch. 546 of the Laws of 1909 are unrelated to the proper execution of the duties of the judicial department and that he cannot be appointed as its administrative officer to aid in the administration of the judicial affairs of the state.

In this view of the nature of the revisor's duties, thus sought to be imposed, the inquiry arises: Can the legislature impose his selection and appointment on the justices of this court, as *ex officio* trustees of the state library, he being an officer charged with legislative duties? This presents the questions: (1) Is he an officer or employee of the state whose appointment can be delegated by the legislature? (2) Can the legislature, as provided by the terms and conditions of the statute, delegate the function of fixing the amount of his compensation? (3) Does the constitution inhibit the justices of this court, in the capacity of *ex officio* trustees of the state library, from performing the duty of selecting him for an office of the state?

Respecting the first of the above inquiries, it seems to me that under ch. 546 of the Laws of 1909 the revisor is an officer within the usual and accepted meaning of the term, because this law imposes a special trust and charge on him and he acts as an agency of the state for performing specific duties for the benefit of the public. The law also prescribes that the incumbent shall receive a compensation and hold the position for a specified term. In addition to imposing the duty on the trustees of selecting this officer, it requires them to fix his compensation, remove him for cause deemed sufficient by them, to approve his appointments of assistants, clerks, and stenographers, and to approve their compensation. In my

judgment, these duties, so imposed on the trustees by this statute, are different in their nature and more extensive in their scope than those imposed by the law as it theretofore existed and which appertained to the management of the state library and the appointment of a librarian, a reporter, and their assistants.   To charge the trustees of the state library with all these duties for the benefit of the state converts the trusteeship into an office of public trust for carrying into execution a part of the functions of the state.   It pertains to powers and duties which do not inhere in the judicial department, and the law thus imposes on the justices of this court an office of the state such as is prohibited by sec. 10 of art. VII of the state constitution, providing that "the judges of the supreme court . . . shall hold no office of public trust, except a judicial office, during the term for which they are respectively elected."   Manifestly, this inhibition does not include such functions as the administration of the affairs of the state library and of the reporter's department, which are connected with the execution of duties for the state which are related to the carrying into effect of the judicial power.   This act attempts to impose such duties on the members of this court, as ex officio trustees of the state library, as makes the trusteeship an office of public trust of such a character as the justices are prohibited from holding by the constitution.

In my judgment the practical construction given to prior legislation cannot control in testing the validity of the law embodied in this chapter and in ch. 547 of the Laws of 1909, because this legislation attempts to impose duties and functions on the trustees of the state library of a public character which are materially different from those imposed by any prior legislation.   The legislature manifestly adopted ch. 547 of the Laws of 1909, authorizing "the trustees of the state library to purchase certain copyrights and rights to annotations to the statutes," as a part of a scheme which led to the adoption of ch. 546 of the Laws of 1909.   These chapters were

approved at the same time and their contents refer to the same subject matter. When thus considered together, the conclusion that they deal with a subject unrelated to the judicial department of the government is emphasized. These considerations lead to the conclusion that these acts attempt to impose duties and functions on the justices of this court, as *ex officio* trustees of the state library, which are nonjudicial in their character and purely administrative acts not necessarily or properly connected with the execution of the judicial power, and obviously imposed by the legislature on the members of this court as *ex officio* trustees of the state library. To assume these duties is in my opinion to hold an office of trust pertaining to a matter outside of the judicial branch of the government. This is in conflict with the provisions of sec. 10 of art. VII of the state constitution and renders the legislation invalid. If this were the opinion of the majority of the justices no further action for the appointment of a revisor could follow. Since, however, the majority of the justices are of the opinion that ch. 546 of the Laws of 1909 is valid, I shall deem it, for the present purposes, an interpretation of the law of the state. Under these circumstances, I shall participate in the performance of the duties and functions imposed by this statute on the members of this court and accordingly shall act in executing the provisions of the statute.

Upon the question of whether the legislature had the power to delegate the selection of a revisor, I regard sec. 9 of art. XIII of the state constitution as applicable and decisive. It provides:

"All other officers whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people or appointed, as the legislature may direct."

As I have stated, the functions of the revisor, as imposed by this statute, make him an officer of the state within the contemplation of law. His appointment can be delegated by the

legislature under this constitutional provision to such an appropriate agency as is not prohibited by the constitution and laws from executing such a legislative mandate. Since, however, the justices of this court are disabled from performing any function for the state in the nature of an office of public trust, the duty must be imposed on some agency other than the members of this court.

As regards the power of the legislature to delegate the authority to fix the revisor's compensation for his services, I think the law attempts no more than to authorize the appointing power to ascertain facts and circumstances respecting the value of the revisor's services as imposed by the law and to determine such amount within the prescribed limit. This does not impress me as a delegation of legislative power, but as an act done for the legislature which is administrative in its nature and which the legislature may properly delegate.

These observations cover my views respecting the appointment of a revisor under ch. 546 of the Laws of 1909.

KERWIN, J. I concur, substantially, in the views expressed by Mr. Justice SIEBECKER in the foregoing opinion.

TIMLIN, J. (*dissenting*). Ch. 546, Laws of 1909, provides that upon the passage of that act, and thereafter on or after the third Wednesday in January in each year in which the legislature shall meet in general session, the trustees of the state library shall appoint a revisor of the statutes to be known as "revisor." The revisor and his assistants shall be subject to removal at any time by the trustees for any cause deemed sufficient by them, and upon any such removal the trustees may appoint a successor to such revisor or assistant. Subject to such removal for cause, the revisor so appointed is to hold his office for two years and until his successor shall have been appointed and qualified. How he shall qualify is not specified; therefore he must qualify under sec. 28, art. IV,

Const. Subject to the approval of these trustees the revisor may appoint such assistants, clerks, and stenographers as may be necessary and fix their compensation. The duties of the revisor are then set forth, among which are:

"To formulate and prepare a definite plan for the order, classification, arrangement, printing, and binding of the stat- .utes and session laws, and between and during sessions of the legislature to prepare and at the beginning of each session of the legislature to present to the committee on revision of each house, in such bill or bills as may be thought best, such consolidation, revision, and other matter relating to the statutes or any portion thereof as can be completed from time to time."

Other duties are to keep and maintain in the state library in duplicate a loose-leaf set of statutes with paragraphs of section or section numbers and an alphabetical card index referring thereto, notes of court decisions, index of the statutes whenever ordered by the legislature, etc. The revisor whose office is thus created is a permanent state officer holding for a specified term and until his successor is appointed and qualifies, and exercises large powers in aid of the legislative branch of the state government and also large powers of appointment. His work resembles that of an ordinary legislative committee. The trustees of the state library are from time to time to determine the salary of this office and fix the compensation of assistants, clerks, and stenographers, fill the office at the expiration of the term, remove and reappoint as above indicated. The duties of the trustees in this matter of appointment, in fixing salaries, removals, and reappointment are also permanent and continuous, devolving upon the board of trustees for all time thereafter.

By ch. 547, Laws of 1909, the same trustees are authorized to purchase all rights of publication of the statutes of this state, indexes thereto, and all annotations thereof, and all copyrights or other rights, together with complete annotations subsequent to the completion of the Supplement of 1906.

Fifteen thousand dollars is appropriated for the latter purpose.

At the time of the passage of these acts the "trustees of the state library" was an existing body or board consisting of the seven judges of the state supreme court and the attorney general of the state (sec. 367, Stats. 1898), and prior to the enactment of the statutes in question this board had certain duties imposed upon it by law, but none of the scope and extent now attempted to be conferred. I am however quite satisfied that some of the duties formerly imposed on this board were not such as judges of the supreme court ought to exercise. Pursuant to the acts in question the judges of the supreme court, under the thin disguise of trustees of the state library, are to appoint to this permanent office for a specified term, to fix the salary, to confirm the appointment of assistants, clerks, and stenographers, to remove the revisor or his assistants for cause satisfactory to them, to appoint others in their stead, to make new appointments from time to time at the expiration of the official term or in case of other vacancy, and to enter into negotiations for and make contracts of purchase for the state. No power of appointment heretofore attempted to be conferred upon the judges of this court, or upon this court, by the legislature has gone to this extent, nor do I think any American court has ever gone to the extent of upholding such a law, although there are many extraordinary decisions on this subject suggesting that the courts have not always applied to themselves the same strictness with reference to constitutional limitations as they apply to others.    66 Cent. Law J. 24–34. The constitution of this state (sec. 2, art. VII) provides that: "The judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, circuit courts, courts of probate, and in justices of the peace."    Sec. 3, art. VII: "The supreme court, except in cases otherwise provided in this constitution, shall have appellate jurisdiction only."    Sec. 10, art. VII: "They shall hold no office of pub-

lic trust, except a judicial office, during the term for which they are respectively elected."

The constitution also in the usual form recognizes the division of governmental power into three departments, legislative, executive, and judicial, and provides (sec. 1, art. IV): "The legislative power shall be vested in a senate and assembly." Sec. 1, art. V: "The executive power shall be vested in a governor." Sec. 2, art. VII: "The judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, circuit courts, courts of probate, and in justices of the peace." The legislation in question offends against the constitution in several particulars. Legislative power cannot be delegated to the courts. *In re North Milwaukee,* 93 Wis. 616, 67 N. W. 1033. Fixing the salary of the incumbent of this office is an exercise of legislative power. *Madison v. Madison G. & E. Co.* 129 Wis. 249, 108 N. W. 65; *Smith v. Strother,* 68 Cal. 194, 8 Pac. 852. This seems to me incontrovertible because:

"In doing this the judge would be determining no right or obligation pertaining to person or property on facts already existing, but would be laying down a rule to be applied to a case the facts of which must afterwards transpire. As this would be an exercise of legislative power not expressly directed or permitted by the constitution to a court or judicial officer, the act must be declared unconstitutional."

Between a legislative act performed by a member of the supreme court openly as one of the court, or individually as a private person, or as one of the trustees of the state library there is no room for distinction. The legislature has no authority to delegate legislative power to the trustees of the state library. If the position of revisor were a temporary one to terminate when a particular act or undertaking was accomplished, or if he could be considered an officer aiding in the administration of the judicial functions, other questions might arise upon which I express no opinion. If the supreme

·court judges can be authorized to fix the salary of this office, I do not see why they could not be authorized to fix the salary of every other officer whose salary is not fixed by the constitution nor by that instrument expressly committed to the determination of some other officer or branch of the government.

Again, with respect to the power of appointment of the legislative assistant called a revisor, the power of confirmation of his appointments of his subordinates, and the power of removal and reappointment, I consider these powers foreign to judicial duties or functions, and the attempt to confer them upon this court invalid as contrary to the plan of the constitution with reference to the division of governmental powers into three departments.

The same objection applies to the power of making contracts for the state for the purchase of all rights of publication of the statutes of this state now existing. These are not judicial duties and therefore not to be exercised by members of this court. See *State ex rel. Young v. Brill,* 100 Minn. 499, 527, 111 N. W. 249, 639, where the cases on this subject will be found collected.

I do not see how I could sit in judgment upon the legality of these salaries so fixed, these appointments so made or confirmed, or this contract of purchase, if I took part in making the appointments, fixing the salaries, approving the appointments of subordinates, or making the contract of purchase. I believe I have no right to disable myself from performing the duties of a judge of the supreme court. I do not think that as a judge of this court administering the law I should myself set the example of violating the constitution. I cannot imagine how, after participating in this breach of constitutional law, I could impartially sit in judgment upon other like breaches performed by subordinate judicial officers under the authority of similar unconstitutional statutes in the future.

Another grave consideration I think deserves mention. No

power exercised by officers of the government tends more strongly to draw these officers into the field of political intrigue and corruption than the power of appointment. For the honor of the American judiciary the courts, I think, should put aside the temptation to exercise this power. Excuses for or reasons justifying the exercise of this power of appointment in other cases forbid its exercise in the instant case. As in *State ex rel. Brown Co. v. Myers,* 52 Wis. 628, 9 N. W. 777, where it was said that commissioners of equalization are not officers within the meaning of the constitution; "they are merely appointed to do a specific act, and when that act is performed their power ceases," followed in *Foster v. Rowe,* 128 Wis. 326, 336, 107 N. W. 635. Or in *State ex rel. Gubbins v. Anson,* 132 Wis. 461, 112 N. W. 475, where the power of appointment of jury commissioners by the circuit judges is upheld on the ground that the "machinery for obtaining such jurors with promptness and certainty and of suitable quality is so germane to the judicial function that there is no imposition of executive power in authorizing the courts, or the judges thereof, to select or direct such machinery."

A third ground of invalidity is that the judges of this court in performing the duties attempted to be imposed by the statutes in question as members of the board of trustees of the state library are holding and exercising an office of public trust other than a judicial office. It seems to me impossible to avoid the conclusion that members of an existing board upon which is conferred by statute the continuing power of appointment to this office, the power of fixing the salaries and the power of confirming the appointments of subordinates, and the power of removal and reappointment, are holding and exercising an office of public trust.

"An office is where, for the time being, a portion of the sovereignty, legislative, executive, or judicial, attaches, to be exercised for the public benefit." *U. S. ex rel. Boyd v. Lockwood,* 1 Pin. 359, 363; *Att'y Gen. v. Drohan,* 169 Mass. 534,

48 N. E. 279; *U. S. ex rel. Noyes v. Hatch,* 1 Pin. 182; *State v. Pederson,* 135 Wis. 31, 114 N. W. 828.

,While there are cases like *Russell v. Cooley,* 69 Ga. 215, which is diametrically opposed to *Case of Supervisors of Election,* 114 Mass. 247, and which also inevitably led the Georgia court into that lawless condition illustrated in *Shreve v. Pendleton,* 129 Ga. 374, 58 S. E. 880, and in *Fox v. McDonald,* 101 Ala. 51, 13 South. 416, where it is ruled that the power of appointment to public office is an executive function when the statute has committed that power to the executive, a legislative function when the statute authorizes the legislature to act, and a judicial power when the statute authorizes the court to make the appointment, I cannot think that these decisions are correct, consistent with prior decisions of this court, or conformable to our state constitution. The New York cases, like *Striker v. Kelly,* 7 Hill (N. Y.) 9, reversed on another point in 2 Denio, 323; *Sweet v. Hulbert,* 51 Barb. 312; *Citizens' Sav. Bank v. Greenburgh,* 173 N. Y. 215, 65 N. E. 978; and *In re Rupp,* 28 Misc. 703, 59 N. Y. Supp. 997, while they might tend to uphold the statutes in question from one viewpoint, are conclusive against their validity so far as they attempt to confer the power to fix salaries, to confirm appointments, to remove appointees, to exercise these powers continuously, or to make contracts for the state. I am not convinced by the fact that the Wisconsin legislature has in many instances vested certain appointive powers in this court or in the circuit court. None of these instances cover the case at bar or approach it, in my judgment. The advisory office of practical construction of a constitution by other departments of government must, in the nature of things, be limited to the very case theretofore passed upon. Otherwise a single infraction of the constitution long acquiesced in might break down the whole instrument.

"Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the constitution, and appointed judicial tribunals

to enforce it. A power is frequently yielded to because it is claimed, and it may be exercised, for a long period, in violation of the constitutional prohibition, without the mischief which the constitution was designed to guard against appearing, or without any one being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the constitution." Cooley, Const. Lim. (7th ed.) 102–107; *Milwaukee Co. v. Isenring,* 109 Wis. 9, 27, 85 N. W. 131.

The legislative progress in this direction in our state rather impresses me with the view that it is high time to raise the constitutional objection to this class of legislation.

My objection to acting under this law is in no degree personal to the distinguished member of the bar who has received the appointment of revisor at the hands of the majority of this court. The objections here formally written out and spread upon the records were made by me long before his name was proposed for appointment or his appointment in any way considered. I must, however, with all due respect to the legislative branch of the state government, decline to act under the laws in question.