INTEGRATION OF BAR CASE: IN RE CONSTITUTIONALITY OF CHAPTER 315, LAWS OF 1943.*

*September 18—November 9, 1943.*

* Motion for rehearing denied, without costs, on January 18, 1944.

For the petitioners, briefs were filed by *Holmes & Shuttleworth* of Madison, and *Daniel H. Grady* of Portage.

For the respondent, briefs were filed by the *Attorney General* and *James Ward Rector,* deputy attorney general.

In favor of the validity of the act, a brief *amicus curiæ* was filed by *Allan T. Pray* of Ashland, *John P. McGalloway* of Fond du Lac, *Walter T. Bie* of Green Bay, *O. A. Oestreich* of Janesville, *Walter W. Hammond* of Kenosha, *Q. H. Hale* of La Crosse, *Robert M. Rieser* and *Harold M. Wilkie,* both of Madison, *Frank T. Boesel, Wm. Doll, Ralph M. Hoyt, H. F. Lichtsinn, Paul R. Newcomb, Benjamin Poss, Carl B. Rix,* and *Edmund B. Shea,* all of Milwaukee, *W. T. Doar* of New Richmond, *Harlan B. Rogers* of Portage, *A. J. O'Melia* of Rhinelander, *Richard T. Reinholdt* of Stevens Point, *John S. Sprowls* of Superior, *Marcus Jacobson* of Waukesha, *Claire B. Bird* of Wausau, *John C. Doerfer* of West Allis, and *Ray B. Graves* of Wisconsin Rapids.

Against the validity of the act, a brief *amicus curiæ* was filed by *Harry T. Jordan* of Hillsboro, *A. E. Bleekman, Otto Bosshard, Lawrence J. Brody, Hubert V. Fuller, A. P. Parsons, Otto M. Schlabach, Clarence J. Weber, F. E. Withrow,* and *Albert C. Wolfe,* all of La Crosse, *Ralph Freeze* of La Farge, *Wm. C. A. Antoine* and *C. B. Peterson,* both of

Prairie du Chien, *Levi H. Bancroft, Edgar Ewers, Franklin E. Fogo,* and *Leo P. Lownik,* all of Richland Center, *O. W. Sprecher* of Sparta, *J. Henry Bennett, Olga Bennett, Victor H. Breitenfield, M. N. Daffinrud, Martin Gulbrandsen, J. A. Moen,* and *Wayne B. Schlintz,* all of Viroqua, and *D. M. Langve* of Westby; and a separate brief by *William H. Spohn* of Madison; and one by *William B. Rubin* of Milwaukee.

## HISTORY.

ROSENBERRY, C. J.  In view of the nature of the subject matter dealt with and its importance to the people of the state of Wisconsin as well as to the members of the bar of this state, it seems appropriate to begin the discussion with a short outline of the steps that have been taken in this and other jurisdictions relating to the integration of the bar.

For more than twenty years, in one form or another, the matter has been before the Wisconsin State Bar Association, and so far as the record discloses it has met with the approval of the association.  By 1935, consideration of the matter had reached such a stage that it seemed appropriate to present it to the legislature.  A bill was introduced into the senate known as Bill No. 119, S.  By the terms of that bill the bar was to be completely integrated by act of the legislature itself. The bill passed both houses but was vetoed by the governor. A similar bill introduced into the assembly was indefinitely postponed.  In 1937, two bills were introduced into the senate, one of which was withdrawn.  A companion bill, No. 424, A., was introduced into the assembly, was ordered engrossed and read a third time but no further action was taken due to the *sine die* adjournment of the legislature.  In 1939, Bill No. 462, A., was introduced into the assembly and passed but was nonconcurred in by the senate.  Bills were introduced into the senate and assembly in 1941,—Bill No. 153, A., was passed by the assembly and considered by the senate but final

action was not taken because of the *sine die* adjournment of the legislature.

The bills introduced in 1937, 1939, 1941, and 1943, while not identical, were substantially the same. Each created an association to be known as the State Bar of Wisconsin and conferred upon the supreme court power to provide by order for the organization of the association.

Since discussion of the matter was begun in Wisconsin, the matter of integration has been considered in other states. The bar has been integrated in twenty-one states. See margin.[1]

Integration was accomplished by three different methods: (1) By the enactment of detailed statutes; (2) by the enactment of a short statute conferring authority upon the highest court of the state to integrate the bar; and (3) by rule of court without statutory authority in the exercise of its inherent power.

With a single exception no state which has integrated the bar, either by act of the legislature or order of the court, has returned to the former practice. In 1929, the legislature of Oklahoma passed what was known as the State Bar Act. This act in effect unified or integrated the bar of that state. It was repealed by the legislature of 1939, whereupon the supreme court in the exercise of its inherent power upon the petitions of the board of governors of the state bar and various bar associations within the state entered an order October 10, 1939, providing for the organization of the Oklahoma Bar Association. That order has ever since remained in force. *In re Integration of State Bar of Oklahoma* (1939), 185 Okla. 505, 95 S. W. (2d) 113.

---

[1] (1) North Dakota, (2) Alabama, in 1921, (3) Idaho, in 1923, (4) New Mexico, in 1925, (5) California, in 1927, (6) Nevada, (7) Oklahoma, in 1929, (8) Mississippi, in 1930, (9) South Dakota, (10) Utah, in 1931, (11) Washington, (12) Arizona, (13) North Carolina, in 1933, (14) Kentucky, in 1934, (15) Oregon, (16) Michigan, in 1935, (17) Nebraska, in 1937, (18) Virginia, in 1938, (19) Texas, (20) Wyoming, in 1939, (21) Louisiana, in 1940.

Enough has been said to indicate that the matter of bar integration is not a sporadic or evanescent movement. The movement was called into being to meet situations in the various jurisdictions which could not be dealt with efficiently under presently existing laws. Scattered as the states are from the Atlantic to the Pacific and from Canada to the Gulf of Mexico, the extent of the movement is strong evidence of the fact that there is a general widespread recognition of the fact that the conduct of the bar is a matter of general public interest and concern. We shall postpone to a later time a discussion of the merits and demerits of bar integration.

## Was Chapter 315, Laws of 1943, Validly Enacted?

It is the contention of the petitioners that ch. 315, Laws of 1943, which was Bill No. 56, S., was not validly enacted because it was not concurred in in the assembly by a two-thirds vote of all those present. Bill No. 56, S., originated in the senate where it was duly and regularly passed, messaged to the assembly, which concurred therein, was duly authenticated and sent to the governor who vetoed it and returned it to the senate with his reasons therefor. When it reached the senate it was passed over the governor's veto and no question is raised in regard to that.

On Wednesday, May 5, 1943, at 9 o'clock a. m., the assembly met. The roll was called,—89 members were present, 11 absent. Thereafter Assemblymen Graf and Vogel asked to be recorded present. The business of the house was proceeded with. At 10 o'clock a. m. the house returned to the third order of business. "Motions may be offered." Leaves of absence were granted to Assemblymen Tank, Rohan, and Double for the remainder of that day's session. Assemblyman O'Connell raised a point of order that pairs on the vote to override the governor's veto were not proper. Speaker Thomson ruled that it was proper to pair on all ques-

tions. From this ruling no appeal was taken. The house then proceeded to the consideration of Bill No. 56, S. The journal entries are as follows:

"No. 56, S.,

"Providing for the organization and government of the state bar of Wisconsin.

"The question was: Shall the bill be concurred in notwithstanding the objections of the acting governor?

"The roll was ordered.

"The vote follows:

"Ayes—Angwall, Barnard, Boyson, Burmaster, Catlin, Christensen, Clark, Clasen, Collar, Cook, Daugs, Ebert, Feierstein, Finch, Fisher, Foley, Fritzen, Graf, Grassman, Hamlin, Keppler, Larson, Lenroot, Long, Ludvigsen, Lynch, McBride, McIntyre, Meunier, Miller, Nelson, Nicol, Nuss, Peabody, Pfennig, Pyszczynski, Rice Ora, Rice Richard, Riley, Rundell, Ryczek, Schmitz, Schreiber, Siebert, Spearbraker, Van De Zande, Varda, Westfahl, Woodhead, Zoller, and Mr. Speaker—51.

"Noes—Baker, Beggs, Benson, Brunner, Canniff, Chapple, Engebretson, Goldthorpe, Greene, Kostuck, Kryszak, Lueck, McParland, Markey, Mullen, Nawrocki, O'Connell, Padrutt, Pritchard, Sweeney, Sykes, Vogel, Waller, Wegner, and Youngblood—25.

"Absent or not voting—Austin, Brom, Gunderson, Heden, Keegan, Luedtke, Woerth, and Youngs—8.

"Paired—Mleziva, Hammergren, Double, Runden, Rohan, Frazell, Tank, Christman for the bill and to override the governor's veto; McCutchin, Genzmer, Krause, McDowell, Wheelock, Hanson, Luebke, Squires against the bill and to sustaining the governor's veto—16.

"Motion carried.

"Messaged to the senate by unanimous consent."

After the call of the roll the next morning, May 6, 1943, as appears from the journal, the following proceedings were then had:

"Correction of the Journal.

"Mr. Genzmer stated that he was present although paired when the vote was taken on Bill No. 56, S.

"Mr. Luebke stated that he was present although paired when the vote was taken on Bill No. 56, S.

"Mr. McCutchin stated that he was present although paired when the vote was taken on Bill No. 56, S.

"Mr. Beggs moved that the journal of May 5th be corrected to conform to the true facts; that in answer to the question that pairs would be counted on Bill No. 56, S., to override the governor's veto, and that in answer to that question, the chair stated that pairs would be counted.

"Mr. Speaker ruled the motion out of order.

"Mr. Beggs appealed to the decision of the chair.

"The question was: Shall the decision of the chair stand as the judgment of the assembly?

"The roll was ordered.

"The vote follows:

"Ayes—Angwall, Austin, Baker, Barnard, Boyson, Brunner, Burmaster, Canniff, Christensen, Clark, Collar, Cook, Double, Ebert, Feierstein, Finch, Fisher, Frazell, Fritzen, Graf, Grassman, Gunderson, Hamlin, Hammergren, Keegan, Keppler, Krause, Larson, Lenroot, Long, Ludvigsen, Lueck, Luedtke, Lynch, McBride, McDowell, McIntyre, Meunier, Miller, Mleziva, Nicol, Nuss, Peabody, Pfennig, Pritchard, Pyszczynski, Rice Ora, Rice Richard, Riley, Rundell, Runden, Ryczek, Schmitz, Schreiber, Siebert, Spearbraker, Squires, Tank, Van De Zande, Westfahl, Woodhead, Youngblood, and Zoller—63.

"Noes—Beggs, Chapple, Daugs, Foley, Genzmer, Greene, Kostuck, Luebke, McCutchin, McParland, Markey, Mullen, O'Connell, Padrutt, Sweeney, Varda, Vogel, Waller, and Wegner—19.

"Absent or not voting—Benson, Brom, Catlin, Christman, Clasen, Engebretson, Goldthorpe, Hanson, Heden, Kryszak, Nawrocki, Nelson, Rohan, Sykes, Wheelock, Woerth, Youngs, and Mr. Speaker—18.

"Motion carried.

"Mr. Nelson stated that had he been in his seat he would have voted aye.

"Mr. Youngs stated he did not vote on the question because he was absent during the vote on the bill yesterday. But if he would have been present, he would have voted for nonconcurrence.

"Mr. O'Connell asked unanimous consent that his impression of the speaker's ruling be placed in the journal.

"Mr. McBride objected.

"Mr. O'Connell moved that his impression of the speaker's ruling be placed in the journal.

"Mr. Pfennig raised the point of order that the motion was out of order.

"The speaker ruled the point of order well taken.

"The journal of May 5th was approved."

Upon its receipt in the senate the bill was duly authenticated by the presiding officers of the senate and the assembly and certified to by the chief clerk of the senate and deposited with the secretary of state for publication. After the decision in the case of *Goodland v. Zimmerman, supra,* it was published on June 16, 1943.

Petitioners sought to amend or supplement the record by affidavits to the effect that Assemblyman Ernest A. Heden was present on the floor of the assembly at the time it acted upon Bill No. 56, S., on May 5, 1943. The affidavit of Robert McCutchin was offered to show that he was present on the floor of the assembly but did not vote on the bill for the reason that he was paired. A similar affidavit was filed by William Luebke, a member of the assembly, and also by Assemblyman Elmer L. Genzmer. There was also a supporting affidavit by Aldric Revell, a newspaper reporter.

The first question for decision is this: Upon what basis is the question to be decided?

The contention that ch. 315, Laws of 1943, was not validly enacted raises a question of constitutional law of the highest importance for the reason that it not only affects the validity of ch. 315 but of an unknown number of acts heretofore passed by the Wisconsin legislature and for that reason will receive our most careful and thorough consideration. The relevant constitutional provisions are as follows:

Sec. 8, art. IV, provides:

"Each house may determine the rules of its own proceedings, punish for contempt," etc.

Sec. 10, art. IV, provides:

"Each house shall keep a journal of its proceedings and publish the same, except such parts as require secrecy. . . ."

Sec. 10, art. V, provides:

"Every bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor; if he approve, he shall sign it, but if not, he shall return it, with his objections, to that house in which it shall have originated, who shall enter the objections at large upon the journal and proceed to reconsider it. . . . If, after such reconsideration, two thirds of the members present shall agree to pass the bill, or the part of the bill objected to, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two thirds of the members present it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of the members voting for or against the bill, or the part of the bill objected to, shall be entered on the journal of each house respectively. . . ."

(1) In some jurisdictions it is held that the enrolled bill is conclusive as to all matters, so as to preclude any investigation as to the method of its enactment. Among the jurisdictions so holding are the United States, California, Indiana, Kentucky, and New Jersey. See cases cited 40 L. R. A. (N. S.), Doctrine of absolute conclusiveness, p. 4; *Marshall Field & Co. v. Clark* (1892), 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294; *State ex rel. Reed v. Jones* (1893), 6 Wash. 452, 34 Pac. 201; *State ex rel. Dunbar v. State Board* (1926), 140 Wash. 433, 249 Pac. 996.

(2) In other jurisdictions it is held that the journals may be resorted to for the purpose of showing that the enrolled bill is erroneous or invalid. Among these is Wisconsin. *Bound v. Wisconsin Central R. Co.* (1878) 45 Wis. 543; *Meracle v. Down* (1885), 64 Wis. 323, 25 N. W. 412;

*McDonald v. State* (1891), 80 Wis. 407, 50 N. W. 185; *State v. Wendler* (1896), 94 Wis. 369, 68 N. W. 759; *Milwaukee County v. Isenring* (1901), 109 Wis. 9, 85 N. W. 131; *Weed v. Bergh* (1910), 141 Wis. 569, 124 N. W. 664; *State ex rel. Postel v. Marcus* (1915), 160 Wis. 354, 152 N. W. 419; *State ex rel. Pollard v. Board of Medical Examiners* (1920), 172 Wis. 317, 177 N. W. 910; *State v. P. Lorillard Co.* (1923) 181 Wis. 347, 193 N. W. 613; *State ex rel. Crucible S. C. Co. v. Wisconsin Tax Comm.* (1925) 185 Wis. 525, 201 N. W. 764; *B. F. Sturtevant Co. v. Industrial Comm.* (1925) 186 Wis. 10, 202 N. W. 324; *Loomis v. Callahan* (1928), 196 Wis. 518, 220 N. W. 816; *State ex rel. Wisconsin Dev. Authority v. Dammann* (1938), 228 Wis. 147, 277 N. W. 278, 280 N. W. 698.

(3) In practically all jurisdictions it is held that the enrolled bill cannot be shown to be erroneous or invalid by any other testimony than that of the journals and likewise that the journal cannot be shown erroneous by oral testimony. There is but one exception to this rule and that is the state of New Jersey and there the rule is founded upon a statute. Prior to the enactment of that statute, the court adhered to the enrolled-bill rule. *Pangborn v. Young* (1866), 32 N. J. Law, 29. It has been so held by the United States courts and courts of Georgia, Illinois, North Carolina, Alabama, Delaware, Florida, Idaho, Indiana, Iowa, Kentucky, Michigan, Missouri, Nebraska, North Carolina, and Ohio. For cases see 4 Wigmore, Evidence, p. 684.

However, it is the general rule that where the constitution requires certain things to be entered upon the journal such requirements must be complied with or the bill is not validly enacted. So held in the states of Alabama, Kansas, Michigan, Illinois, West Virginia, Kentucky, Missouri, North Carolina, Wyoming, Nebraska, and the federal courts. For cases see 1 Lewis' Sutherland Statutory Construction (2d ed.), p. 91,

sec. 53, note 14. As to those matters of legislative procedure not required to be recorded in the journal, all such requirements will be presumed to have been complied with unless the contrary affirmatively appears from the journal itself.

The recitals of legislative journals cannot be contradicted or altered by memoranda made by legislative officers, by the notes of stenographers, by a minority committee report, by protests of the members of the legislature in order to impeach an enrolled bill. Likewise parol evidence is incompetent to impeach an enrolled bill by showing the disregard of a constitutional mandate in its passage on any ground. So held in Alabama, Colorado, Iowa, North Carolina, Indiana, and Nebraska. See cases cited 40 L. R. A. (N. S.) p. 30, under the heading, "Impeachment of bills by evidence other than legislative journals."

A subsidiary question is, May the court receive and consider oral evidence tending to supplement, contradict, or modify the journal entries? As already stated, the general rule is that it may not. This rule rests upon the soundest considerations of public policy. The constitution requires that the house shall keep a journal of its proceedings. While the constitution requires that each house shall keep a journal, very little is said in regard to the contents of the journal.

By sec. 20, art. IV, it is provided:

"The yeas and nays of the members of either house on any question shall, at the request of one sixth of those present, be entered on the journal."

Sec. 10, art. V, which provides how bills shall be passed over the veto of the governor, has already been referred to.

Sec. 6, art. VIII, which deals with the matter of public debts, provides:

"and the vote of a majority of all the members elected to each house, to be taken by yeas and nays, shall be necessary to the passage of such law . . ."

but it is not specifically provided that the vote shall be entered upon the journal.

Sec. 8, art. VIII, requires that the yeas and nays be taken and entered on the journal on the passage of any fiscal bill.

Sec. 4, art. XI, provides that upon the enactment of a general banking law, "the vote of two thirds of all the members elected to each house, to be taken by yeas and nays, be in favor of the passage of such law." The yeas and nays are not required to be entered upon the journal.

It is obvious from a consideration of these provisions of the constitution that a large discretion was left with the legislature as to the contents of the journals.

By the great weight of authority it is held that an enrolled bill will be declared void where the journals fail to show upon final passage thereof a yea and nay vote was taken which together with those voting for and against a measure was spread upon the journals if the constitution so requires. It has been so held in Alabama, Arkansas, Colorado, Delaware, Florida, Idaho, Missouri, Montana, Oregon, Virginia, Wyoming, and in the federal court. For citation of authorities see 40 L. R. A. (N. S.) p. 19, under heading, "Failure to record vote as constitution directs."

Evidence *aliunde* the journal may relate, (1) to the legislative procedure followed in the enactment of a bill; and (2) to divergence between the text of a bill and the enrolled bill.

Contrary to the general rule, it is held in this state that the court will look to the journals, the original bill, the engrossed bill, and the amendments to ascertain whether there is a variance in the text. *Milwaukee County v. Isenring* (1901), 109 Wis. 9, 26, 85 N. W. 131. See also 40 L. R. A. (N. S.) p. 30, under title "Bill as originally introduced," and cases cited. In this connection attention should be called to the fact that sec. 13.22, Stats., makes the printed journals the official record of each house of the legislature. Sec. 327.01

makes the journals *prima facie* evidence of the legislative proceedings. While the court has held that it might look to "any other legitimate evidence" to determine the contents of a bill so far in no case has evidence *aliunde* the record been resorted to. Without stating how the question was made to appear, the court did consider in *Loomis v. Callahan* (1928), 196 Wis. 518, 526, 220 N. W. 816, whether certain amendments were required to be adopted by yea and nay vote and entered in the journal.

The court is committed to the doctrine that the journals may be consulted for the purpose of determining if a bill is validly enacted. There are very strong and cogent reasons why that rule should not be extended. The reasons given for adhering to the enrolled-bill rule, that is, that the journals may not be consulted, apply with increased force to any extension of the journal rule. In *Hunt v. Van Alstyne* (1841), 25 Wend. 605, 610, the court said:

"There are only two modes of contradicting it [the certified enrolment] : 1. By the journals of the two houses, and 2. by parol testimony. The presiding officer had all the benefit of the first; the ayes and noes are taken, and the journal made up under his supervision and control. His means of ascertaining and determining the fact, when he declares the law to be passed, exceed those of any other tribunal that might afterwards be called upon to inquire into it. Besides, the hurry and looseness with which the journals are copied, and the little importance attached to the printed copies, necessarily impair confidence in their correctness. They are most uncertain data upon which to found a judicial determination of the rights of property, much more of great constitutional questions. As to the second mode of contradicting the certificate: The evidence would, if possible, be still more fallible and unsatisfactory. Indeed, we can scarcely imagine a case where, from its nature, the proof would be so subject to the doubtful and conflicting recollection of witnesses. Nothing short of absolute necessity could justify a resort to it. It would hardly deserve weight in contradicting the journal

itself; much less, the certificate of the presiding officer affixed to the law."

In answer to the contention often made that unless an unrestricted judicial inquiry can be made into the truth of the matter the legislature may evade constitutional provisions, BEASLEY, C. J., in *Pangborn v. Young* (1866), 32 N. J. Law, 29, 38, said:

"The principal argument in favor of this judicial appeal from the enrolled law to the legislative journal . . . was, that the existence of this power was necessary to keep the legislature from overstepping the bounds of the constitution. The course of reasoning urged was, that if the court cannot look at the facts and examine the legislative action, that department of government [legislative] can, at will, set at defiance, in the enactment of statutes, the restraints of the organic law. This argument, however specious, is not solid. The power thus claimed for the judiciary would be entirely inefficacious, as a controlling force, over any intentional exorbitance of the lawmaking branch of the government. If we may be permitted, for the purpose of illustration, to suppose the legislature to design the enactment of a law in violation of the principles of the constitution, a judicial authority to inspect the journals of that body, would interpose not the slightest barrier against such transgression, for it is obvious that there could not be the least difficulty in withholding from such journals every fact evincive of such transgression. A journal can be no check on the actions of those who keep it, when a violation of duty is intentional. . . .

"Besides, if the journal is to be consulted, on the ground of the necessity of judicial intervention, how is it that the inquiry is to stop at that point? In law, upon ordinary rules, it is plain that a journal is not a record, and is, therefore, open to be either explained or contradicted by parol proof. And yet, is it not evident that the court could not, upon the plainest grounds, enter upon such an investigation? In the case now in hand, if the offer should be made to prove by the testimony of every member of the legislature, that the journals laid before us are false, and that, as a matter of fact, the enrolled

law did receive, in its present form, the sanction of both houses, no person versed in jurisprudence, it is presumed, would maintain that such evidence would be competent. The court cannot try issues of fact; nor, with any propriety, could the existence of statutes be made dependent on the result of such investigations. With regard to matters of fact, no judicial unity of opinion could be expected; and the consequence would necessarily be, that the conclusion of different courts, as to the legal existence of laws, from the same proofs, would be often variant, and the same tribunal which today declared a statute void, might tomorrow be compelled, under the effect of additional evidence, to pronounce in its favor. *The notion that the courts could listen upon this subject to parol proof, is totally inadmissible, and it therefore unavoidably results, that if the journal is to be taken into consideration at all, its effect is uncontrollable: neither its frauds can be exposed, nor its errors corrected.* And if this be so, and the journal is to limit the inquiry of the judicial power, how obvious the inadequacy, if not futility, of such inquiry!"

Upon a moment's consideration, it is obvious that if the people of the state are to obey its laws some method must be devised by which they may be acquainted with the laws which they are called upon to obey. One of the objections urged to courts having power to say that the legislature in the enactment of a particular law has exceeded its constitutional authority is that it creates uncertainty in the law. This uncertainty would be multiplied many fold if to it were added the fact that a citizen could not rely upon the law published under the authority of the state with the sanction of its legislature but must resort to an investigation, first to the journals and records of the legislature, and next to the memory of those who were present when the law was enacted in order to determine whether a law was validly enacted. No statute of limitations runs against the state. If a law was not validly enacted it can never become a law by the mere lapse of time. The consequences of permitting an investigation of the facts relating to the enactment of a law are such as to lead readily

to the conclusion that judicial investigation should be severely limited. The officers of the legislature are in a better position to know the fact than any court thereafter called upon to consider the matter could possibly be. The determination of the house is announced by the speaker. If his announcement is not in accord with the fact, there can be an appeal from his ruling and the truth established by vote of the members.

While it may well be that the adoption of the opposite rule could have no serious consequences in this particular case, the rule when adopted would govern all cases in which the question of the validity of the enactment of a law was drawn in question. The highest consideration of public policy as well as the great weight of authority support the conclusion that oral evidence cannot be received to contradict, modify, supplement, or correct the journal. What the court would be doing, in effect, if it received and considered such evidence would be to reform the journal whereas under the constitution it is the business of the legislature to keep its journal. It may be true that there is no way by which this constitutional mandate may be enforced, nor is there any way in which its discretion as to the enactment of laws or performance of its other duties be controlled. The legislature, as one of the co-ordinate departments of government, is as supreme in its field as the court is in its field.

We hold in accordance with the weight of authority upon that question that where the constitution requires the entry in the journal of certain steps in the enactment of a bill that it must appear from the journal that those steps have been taken or the act was not validly enacted. In this case the yeas and nays were taken and the result duly entered in the journal in accordance with the constitutional mandate.

It also appears from the journal of May 6, 1943, that an attempt was made to correct the entries in the journal of May 5th, and that the house refused to make the correction. It requires no argument nor citation of authority to show that

when a member rises in his seat and makes a statement of fact that that does not alter the journal of the proceedings of the previous day. In order to make a correction, the correction must be allowed by unanimous consent or by vote of the house. In this respect the correction sought to be made on the 6th day of May had neither the unanimous consent nor the approval of the house. The journal of May 5th was approved as made up.

The petitioners contend that it appears from the journal of May 5th that Bill No. 56, S., was not approved by two thirds of the members present and therefore was not validly enacted. This contention is based upon the fact that upon the roll call on Bill No. 56, S., Heden was marked absent or not voting. It was sought to make it appear by affidavit that Heden was present and not voting. It was thus sought to impeach the journal by parol evidence. This by the great weight of authority already referred to cannot be done. If Heden was present, not being paired, he would have been within Rule 82, which provides:

"Every member present when a question is put, or when his name is called, shall vote, unless the assembly shall, for a special cause, excuse him, but it shall not be in order for a member to be excused after the assembly has commenced voting."

The journal does not show that Assemblyman Heden was excused, therefore if present it must be presumed that he would have done his duty and voted. He did not vote, therefore it must be presumed that he was absent. The law does not presume that a public officer violates his duty. Nothing appearing to the contrary, it is presumed that he did his duty. *Webb v. Carter* (1913), 129 Tenn. 182, 218, 165 S. W. 426.

It is next contended that assemblymen who were paired if present in the chamber at the time the vote was taken should have been counted to ascertain the number present. From

the journal it appears that Mleziva, Hammergren, Double, Runden, Rohan, Frazell, Tank, and Christman for the bill, were either absent with leave at roll call or were granted leaves of absence before Bill No. 56, S., was called up for consideration. Of those paired against the bill Hanson was absent at roll call with leave; McCutchin, Genzmer, Krause, McDowell, Wheelock, Squires, and Luebke were present when the roll was called. On the last roll call before Bill No. 56, S., was considered, McCutchin, Genzmer, Krause, McDowell, Wheelock, Squires, and Luebke were present and voting.

After disposing of Bill No. 56, S., the next business before the assembly was consideration of Bill No. 616, A., which began at 10:30 o'clock. Assemblymen McCutchin, McDowell, Wheelock, and Squires were present and voting. Genzmer, Krause, and Luebke were absent or not voting. It is argued that McCutchin, McDowell, Wheelock, and Squires appearing from the journal to be present and voting just prior to the time when Bill No. 56, S., was called up for consideration and that they appear by the journal to have been present and voting on the consideration of Bill No. 616, A., the next business taken up after disposing of Bill No. 56, S., therefore it must be presumed that they were present in the interim and consequently were present when Bill No. 56, S., was voted upon.

The decision of this question requires us to consider the matter of pairs. It appears that originally pairing was merely an affair of honor between two members of a legislative body who were on opposite sides of a measure which might be called up for vote. They agreed between themselves that neither one would vote upon the measure. It did not deprive them of the right to vote if they chose to disregard their agreement with a fellow member. The only penalty for violation of the agreement was the disfavor of those who knew of the breach.

It is not easy to determine just when pairing came into existence. It apparently was well known in the house of commons in 1743. The device was also employed by the house of lords. It was practiced in congress at least by 1840. It was recognized by congress with the revision of the rules in 1880. It is common in the state legislatures but is forbidden in Georgia, Massachusetts, and South Dakota. For a more extended discussion, see Luce, Legislative Procedure, p. 379.

Rule 83 of the rules of the assembly provides :

"Members may pair on any question by filing a signed statement of the same with the chief clerk, who shall read the pair to the assembly before the vote is taken. A blank form or pair for the use of members shall be provided by the chief clerk. No pair shall be recognized unless one or both of the parties thereto are absent with leave."

In this instance all of the members paired for the bill were absent with leave. One of the members paired against the bill was absent with leave. It thus appears that the rules of the assembly in relation to pairing were fully complied with. Under the rules and practice of the assembly a member who is paired with another member on a question is disqualified from voting on the question upon which he is paired. If the house did not recognize pairs by its rules both members who wished to pair would be compelled to absent themselves from the chamber when the question upon which they were paired was called up for consideration, otherwise they might be compelled to vote under the rules. Recognition of pairing by the rules of the assembly has the same effect so far as the consideration of the question upon which the members are paired is concerned as if they were both absent. The members are in effect absent because they are disqualified from voting and they are so treated by the assembly and have been so treated for many years. They are absent in a legislative sense.

It appears from the assembly journal of 1929, page 1517, that a member present but paired asked permission to vote. The speaker ruled the request out of order, stating that—

"no consent could or should be given or permitted, to any member to disregard a pair, made in accordance with established rules, with another member, who while relying upon the pair was absent with leave of the assembly."

In matters of legislative procedure this court has attached great weight to long-continued legislative practice as affecting the construction of a section of the constitution.

Sec. 1, art. XII, provides:

"Any amendment or amendments to this constitution may be proposed in either house of the legislature, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election," etc.

In *State ex rel. Postel v. Marcus* (1915), 160 Wis. 354, 388, 152 N. W. 419, the question was, What was meant by "entered?" The court first held that it meant that the amendment must be entered at large. Upon reargument and further consideration it was held that the word "entered" may fairly mean either (1) entered at large, or (2) entered by title, number, or other definite or certain reference; that the word is therefore open to construction; and that the latter meaning having been given to it by the legislative and executive officers of the government in administering the section for more than half a century and ever since the adoption of the constitution, such practical construction is entitled to controlling weight.

How shall the presence of a majority be determined?

In *United States v. Ballin* (1892), 144 U. S. 1, 6, 12 Sup. Ct. 507, 36 L. Ed. 321, the court said:

"The constitution has prescribed no method of making this determination, and it is therefore within the competency of the house to prescribe any method which shall be reasonably certain to ascertain the fact. It may prescribe answer to roll call as the only method of determination; or require the passage of members between tellers, and their count as the sole test; or the count of the speaker or the clerk, and an announcement from the desk of the names of those who are present. Any one of these methods, it must be conceded, is reasonably certain of ascertaining the fact, and as there is no constitutional method prescribed, and no constitutional inhibition of any of those, and no violation of fundamental rights in any, it follows that the house may adopt either or all, or it may provide for a combination of any two of the methods. That was done by the rule in question; and all that that rule attempts to do is to prescribe a method for ascertaining the presence of a majority, and thus establishing the fact that the house is in a condition to transact business."

In *In re Gunn* (1893), 50 Kan. 155, 32 Pac. 470, 32 Pac. 948, 19 L. R. A. 519, the supreme court of the state of Kansas had this matter under consideration. In that case it appeared that the presiding officer had attempted to count those who were in the chamber but did not respond to roll call in order to establish a quorum. It was held that in the absence of such a rule the presiding officer could not count a quorum. The so-called Reed rule was a rule of the house and not a method practiced merely by the speaker.

In *State ex rel. Stanford v. Ellington* (1895), 117 N. C. 158, 23 S. E. 250, 53 Am. St. Rep. 580, it was held that—

"it being shown that there was a quorum of a legislative body present in the morning, and it not appearing that there had been an adjournment, it is presumed that there continued to be a quorum present when certain proceedings were had that day."

It was also held that—

"if the records of a legislative body show that less than a quorum of its members were present when the roll was called

and a vote taken, the presumption that a quorum shown to be present earlier in the day continued present when such vote was taken is overcome."

The court also held that—

"Although a quorum of a body is actually present at the time a vote is taken, the presiding officer is powerless to make the members vote, or to count those not voting for the purpose of making up a quorum, in the absence of a rule or express authority to that effect." Citing *United States v. Ballin, supra.*

If the members who were paired upon Bill No. 56, S., had absented themselves from the chamber when that bill was called up for consideration, as they might have done, they would not have been counted in determining who was present at the time the vote was taken. Because they were paired, they were disqualified from voting under the rules and were for all legislative purposes as much absent as if they had absented themselves from the chamber. Recognition of the validity of pairs merely permits the member who is not absent with leave to continue to attend to other legislative matters without being compelled to retire when the bill upon which he is paired is called up. In this case the journal, as finally duly approved without sanctioning any change, does not show that any of those paired against the bill were in fact present in the chamber. Therefore it does not affirmatively appear from the journal that they were present when the roll was called on Bill No. 56, S. In accordance with the practice and interpretation of the legislature, as well as the decisions of the courts which have dealt with the question, it must be held that the bill was concurred in by two thirds of the members present and was validly enacted.

Fears are entertained by some that the constitutional provisions regarding the enactment of legislation will go into complete eclipse and be rendered ineffectual under the rule we find ourselves obliged to adopt in this case. When, however,

one stops to consider that any member has it within his power, even though he be paired, to be recorded as present when the vote is taken, these fears become groundless. If on the other hand a member either carelessly or intentionally sits by and permits himself to be recorded as absent or not voting, he is solely responsible under the rules of the house for the consequences of his act. It is claimed that an attempt was made to require pairs to be counted which is an entirely different thing. The whole theory of pairing is that both of the members paired are absent. If by unanimous consent and the long practice of the house a member who is paired is considered to be absent so far as consideration of the measure upon which he is paired is concerned, the consequences are no different than they would be if the member absented himself from the chamber during the taking of the roll, which he may do unless he should be compelled to attend by a call of the house. It is apparent that the rule that a member paired is considered absent is one of mere convenience. We are unable to discover, in the rules as written and as applied, any intention on the part of the legislature to evade constitutional requirements. In this case the house refused to correct the journal by more than the requisite two-thirds majority required to pass a bill over the veto of the governor. On roll call on that question there were 63 ayes and 19 noes, 18 absent or not voting, it appearing that 6 were absent with leave. Therefore the most that could have been present were 94,—63 voted to sustain the chair. While a two-thirds vote to correct the journal was not required either under the constitution or the rules, it indicates that the house knew what it was doing and did what it intended to do. It would be folly as well as against the great weight of authority for the court to hold in this case that resort may be had to oral evidence to reform the record made by the assembly merely to meet the very unusual conditions which exist in this case. The record of the house must stand as made by the house which is primarily responsible for the en-

actment of legislation. It follows that under the facts of this case and the rules and practice there can be no presumption that a paired member was "present" either in a physical or legislative sense when the roll was called on Bill No. 56, S.

What we have said disposes of propositions A 1, A 2, and by implication, of A 3. Inasmuch as we conclude that neither oral testimony nor other evidence *aliunde* the journal may be received, A 4 (a) and A 4 (b) are disposed of.

We come now to a consideration of A 5.

"In a matter in which concurrence of the members of the house of the legislature by a two-thirds vote is required by the constitution, may the legislature adopt or apply a rule relating to pairs which results in the pairing of a single member against a single member or must the pairs be in the ratio of 2 to 1?"

Upon this proposition we find no authority. So far as our examination and that of counsel goes there are no decided cases upon this point. In this particular case it was ruled that members, that is, one member for one member, might pair upon any question. No appeal was taken from this ruling of the chair and so far as we are advised it has been the uniform practice of the assembly to permit pairs upon all questions one for one, as the speaker ruled. The fact that this may under certain circumstances operate to permit a bill requiring a two-thirds vote to be passed when if the members paired were counted, there would not be the requisite two-thirds vote, is not relevant to our inquiry. It does suggest that the house might well adopt a rule that in cases where a two-thirds vote is required, members should pair two for and one against but no such rule has been adopted. Whether members pair one for one or two for one, they are under the rules of the house considered absent. How they pair does not bear upon the question of who is present.

We have dealt rather extensively with the matter of pairing which is merely a manner of determining by the rules of the

house who is present in a legislative sense when a particular measure is called up for passage. While the leader of the Republican majority in the house of representatives once served notice that thereafter the Republicans would not pair on a question requiring a two-thirds vote except upon a two-for-one basis, that was merely a notice by one group of the terms upon which members of that group would agree to pair and was not a rule of the house. Members of the assembly might under the rules as they now stand pursue a similar course. No member can be compelled to pair let alone to pair upon any particular basis. The rules adopted by the house in no sense contravene the constitution. They have been applied and interpreted for many years in the same way in which they were applied in this case. The assembly follows the legislative practice of a vast majority of the legislatures of the various states. It is held that it was within the power of the legislature to adopt the rule respecting pairs and that the members paired could not be counted for the obvious reason that Rule 83 requires leaves of absence, that no pair shall be recognized unless one or both of the parties thereto are absent with leave. To hold that those not absent with leave should be presumed to be present would be to destroy the rule in regard to pairs or to say, in effect, that members may not pair.

## Is Chapter 315, Laws of 1943, Constitutional?

The petitioners contend that ch. 315, Laws of 1943, if validly enacted is unconstitutional because—

(1) It delegates legislative power to the supreme court in violation of constitutional principles; (2) if the act is put into effect it invalidly imposes burdens upon members of the bar with respect to their occupation in violation of the Fourteenth amendment to the constitution of the United States; and (3) if put in force it denies members of the bar equal protection of the laws and denies members of the bar the benefit

of the federal statute in relation to the practice of the law in federal courts.

(1) In order to determine whether ch. 315, Laws of 1943, is unconstitutional because it delegates legislative power to the supreme court, it is necessary for the court to determine the nature of the powers to be exercised by the supreme court pursuant to the provisions of ch. 315. Petitioners cite no case in support of their contention. Whether the power to integrate the bar is a legislative power or a judicial power has been considered in a large number of cases. This court had occasion to deal with one aspect of this matter in *In re Cannon* (1932), 206 Wis. 374, 375, 397, 240 N. W. 441. In that case it appeared that the defendant had been suspended from the practice of law. The legislature subsequently enacted ch. 480, Laws of 1931, which purported to restore to the suspended attorney his license to practice law and remitted the costs imposed by the judgment of suspension. This act was held invalid for the following reasons:

"(a) It invades the province of the courts and the judicial power conferred upon them by sec. 2, art. VII, Const., admission of attorneys to the bar being strictly a judicial function.

"(b) It is not a general law applicable to all alike, and violates the constitutional guaranty of equality before the law.

"(c) It is an unconstitutional attempt to exercise the power of appointment not in pursuance of a legislative function.

"(d) The legislature is without power to revise a judgment of the court.

"(e) The judgment for costs having been imposed by judicial act as a part of disciplinary punishment authorized by statute, it is entirely beyond the scope of legislative power to interfere with that punishment." (Syllabus, par. 11.)

The court said:

"While the legislature may legislate with respect to the qualifications of attorneys, its power in that respect does not rest upon any power possessed by it to deal exclusively with

the subject of the qualifications of attorneys, but is incidental merely to its general and unquestioned power to protect the public interest. When it does legislate fixing a standard of qualifications required of attorneys at law in order that public interests may be protected, such qualifications constitute only a minimum standard and limit the class from which the court must make its selection. Such legislative qualifications do not constitute the ultimate qualifications beyond which the court cannot go in fixing additional qualifications deemed necessary by the courts for the proper administration of judicial functions. There is no legislative power to compel courts to admit to their bars persons deemed by them unfit to exercise the prerogatives of an attorney at law. The power of the court in this respect is limited only to the class which the legislature has determined is necessary to conserve the public welfare."

Following the *Cannon Case, supra,* the matter was dealt with by the supreme judicial court of Massachusetts, which cited the *Cannon Case* with approval. Under the law of Massachusetts the senate may request the advice of the court as to the constitutionality of a bill pending before it. A bill was introduced regulating the marking of bar-examination questions. Three specific questions were submitted to the court:

(1) Would the legislature usurp the functions of the judiciary in enacting such a bill? (2) Would the bill violate the constitutional declaration of rights? (3) To what extent is the admission of candidates to the office of attorney at law subject to regulation by the legislature?

While these questions did not relate to the power of the court to integrate the bar, they did deal with the power of the courts over members of the bar. The court said:

"Admission to practice as an attorney at law is almost without exception conceded to be a judicial function. Petition to that end is filed in court, as are other proceedings invoking judicial action. Admission to the bar is accomplished and

made open and notorious by a decision of the court entered upon its records. The establishment by the constitution of the judicial department conferred authority necessary to the exercise of its powers as a co-ordinate department of government. It is an inherent power of such a department of government ultimately to determine the qualifications of those to be admitted to practice in its courts, for assisting in its work, and to protect itself in this respect from the unfit, those lacking in sufficient learning, and those not possessing good moral character. . . .

"There is nothing in the constitution, either in terms or by implication, to indicate an intent that the power of the judiciary over the admission of persons to become attorneys is subject to legislative control. . . .

"The inherent jurisdiction of the judicial department of government over attorneys at law is illustrated in several of our decisions to the effect that power to remove an attorney for misconduct, malpractice, or deficiency in character, although recognized by statute (G. L. c. 221, sec. 40, as amended by St. 1924, c. 134), is nevertheless inherent and exists without a statute. . . . No sound distinction can be drawn with respect to attorneys at law between the power to admit and the power to remove under the terms of the constitution.

"Numerous statutes have been passed making provision in aid of the judicial department in reaching a proper selection of those qualified for admission as attorneys to practice in the courts. It is not necessary to review them in detail. Like many other statutes, they have been enacted to enable the courts to perform their duties. They have been enacted, also, in the exercise of the police power to protect the public from those lacking in ability, falling short in learning, or deficient in moral qualities, and thus incapable of maintaining the high standard of conduct justly to be expected of members of the bar. No statute can control the judicial department in the performance of its duty to decide who shall enjoy the privilege of practicing law. Statutes hitherto enacted have been followed as the basis of its action. No contentions have arisen in the courts concerning their validity. Statutes respecting admissions to the bar, which afford appropriate instrumentalities for the ascertainment of qualifications of applicants, are

no incroachment on the judicial department. They are convenient, if not essential, to enable the judicial department properly to perform this duty. The establishment, in 1897, of a state board of bar examiners, in place of the county boards previously existing, is an example. Statutes of that nature are valid provided they do not infringe on the right of the judicial department to determine who shall exercise the privilege of practicing in the courts and under what circumstances and with what qualifications persons shall be admitted to that end. When and so far as statutes specify qualifications and accomplishments, they will be regarded as fixing the minimum and not as setting bounds beyond which the judicial department cannot go. Such specifications will be regarded as limitations, not upon the judicial department but upon individuals seeking admission to the bar. There is no power in the general court to compel the judicial department to admit as attorneys those deemed by it to be unfit to exercise the prerogatives and to perform the duties of an attorney at law." *Opinion of Justices* (1932), 279 Mass. 607, 609, 180 N. E. 725, 81 A. L. R. 1059. See also exhaustive note "Power of Legislature Respecting Admission to the Bar," 144 A. L. R. 150.

It has been held by every court to which the question has been presented that the court has power to integrate the bar and that the integration of the bar is a judicial and not a legislative function. *In re Integration of Nebraska State Bar Asso.* (1937) 133 Neb. 283, 275 N. W. 265; *Matter of Richards* (1933), 333 Mo. 907, 63 S. W. (2d) 672; *Clark v. Austin* (1937), 340 Mo. 467, 101 S. W. (2d) 977; *Matter of Pate* (1937), 232 Mo. App. 478, 107 S. W. (2d) 157; *Campbell v. Third District Com. of Virginia State Bar* (1942), 179 Va. 244, 18 S. E. (2d) 883; *Commonwealth ex rel. Ward v. Harrington* (1936), 266 Ky. 41, 98 S. W. (2d) 53; *In re Sparks* (1937), 267 Ky. 93, 101 S. W. (2d) 194. For extended citation of authorities, see note appended to the cases in 114 A. L. R. 151, 161.

The power to integrate the bar is an incident to the exercise of the judicial power which is vested by the constitution

of the state of Wisconsin in the supreme court, circuit courts, courts of probate, and justices of the peace. Judicial power is not reposed by the constitution in the legislature, hence it cannot delegate it. It necessarily follows that ch. 315, Laws of 1943, is not invalid because it delegates legislative power to the supreme court.

(2) It is next contended that ch. 315, Laws of 1943, denies the equal protection of the laws and is therefore in violation of the Fourteenth amendment to the constitution of the United States. In support of that proposition the cases of *Dent v. West Virginia* (1889), 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623, and *Ex parte Garland* (1866), 4 Wall. (U. S.) 333, 18 L. Ed. 366, are cited. *Ex parte Garland* is probably the strongest case that can be found in support of petitioners' position. On the 24th day of January, 1865, congress passed an act supplementing an act passed July 2, 1862, entitled "An act to prescribe an oath of office, and for other purposes." The supplementary act provided:

"No person, after the date of this act, shall be admitted to the bar of the supreme court of the United States, or at any time after the fourth of March next, shall be admitted to the bar of any circuit or district court of the United States, or of the court of claims, as an attorney or counselor of such court, or shall be allowed to appear and be heard in any such court, by virtue of any previous admission, or any special power of attorney, unless he shall have first taken and subscribed the oath prescribed in 'An act to prescribe an oath of office, and for other purposes,' approved July 2, 1862."

The oath prescribed by the act was briefly as follows:

(1) That the deponent had never voluntarily borne arms against the United States; (2) that he had not voluntarily given aid, countenance, counsel, or encouragement to persons engaged in armed hostility thereto; (3) that he had never accepted office under any authority in hostility to the United States; (4) that he had not yielded voluntary support to any government within the United States hostile or inimical

thereto; (5) that he will support the constitution of the United States, etc.

Garland had been admitted as an attorney and counselor of the supreme court at the December term, 1860. Later he had been a member of the congress of the Confederate States serving from May, 1861, until the final surrender of the forces of the Confederacy. He could not take the oath prescribed by the act of congress. In July, 1865, Garland was granted a full pardon by the President of the United States. He complied with the conditions attached to the pardon and applied for permission to continue his practice as attorney and counselor of the supreme court. His application was opposed and the matter was set down for argument. It was argued by some of the most eminent counsel then at the bar of the court. In the course of its opinion, speaking by Mr. Justice FIELD, the court said (pp. 378, 379):

"The profession of an attorney and counselor is not like an office created by an act of congress, which depends for its continuance, its powers, and its emoluments upon the will of its creator, and the possession of which may be burdened with any conditions not prohibited by the constitution. Attorneys and counselors are not officers of the United States; they are not elected or appointed in the manner prescribed by the constitution for the election and appointment of such officers. They are officers of the court, admitted as such by its order, upon evidence of their possessing sufficient legal learning and fair private character. . . . The order of admission is the judgment of the court that the parties possess the requisite qualifications as attorneys and counselors, and are entitled to appear as such and conduct causes therein. From its entry the parties become officers of the court, and are responsible to it for professional misconduct. . . . Their admission or their exclusion is not the exercise of a mere ministerial power. It is the exercise of judicial power, and has been so held in numerous cases."

The court further said:

"The attorney and counselor being, by the solemn judicial act of the court, clothed with his office, does not hold it as a matter of grace and favor. The right which it confers upon him to appear for suitors, and to argue causes, is something more than a mere indulgence, revocable at the pleasure of the court, or at the command of the legislature. It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency."

From this it is argued that ch. 315, Laws of 1943, the first section of which makes membership in the association, to be known as the State Bar of Wisconsin, a condition precedent to the right to practice law in Wisconsin, operates or may operate so as to deprive an attorney of his right to practice law and is therefore beyond the competency of the legislature. Under the act the conditions of membership are to be prescribed by the order of integration. What those conditions will be has not yet been disclosed but assuming that failure to pay dues as prescribed by the order operates to suspend an attorney's membership in the association, his delinquency is the cause of his suspension. He may comply with the order and continue his practice of the law at any time he chooses. Membership in most associations is made dependent upon compliance with the conditions of membership which usually include the payment of a small fee. The requirement of the payment of a small fee is as much the duty of a lawyer as it is the duty of a member of any other group which enjoys special privileges and have certain prerogatives under the law. No lawyer will be or can be suspended except as a consequence of his own delinquency.

The court held that the act of congress, because of the inability of Garland to take the oath, inflicted upon him a punishment for past conduct and was therefore invalid.

In *Dent v. West Virginia* (1889), 129 U. S. 114, 128, 9 Sup. Ct. 231, 32 L. Ed. 623, Mr. Justice FIELD reviewed the *Garland Case, supra,* as well as the case of *Cummings v. State of Missouri* (1866), 4 Wall. (U. S.) 277, 18 L. Ed. 356. In that case it appears that the legislature of the state of Missouri had attempted to deprive priests of the Catholic church of their rights as such by requiring them to take an oath which they could not take. With respect to its holding in the *Garland Case,* the court said :

That case only determines that "one who has been admitted to practice the profession of the law, cannot be deprived of the right to continue in the exercise of his profession by the exaction from him of an oath as to his past conduct, respecting matters which have no connection with such profession."

In *Dent v. West Virginia, supra,* the court upheld a statute of the state of West Virginia prescribing the qualifications which entitle an applicant to a license to practice medicine.

These cases read in connection with their facts support the position of the respondents rather than that of the petitioners. It is considered that ch. 315, Laws of 1943, in no way violates the provisions of the Fourteenth amendment to the constitution of the United States. It deals with persons admitted to the bar and all members of the bar are treated exactly alike. The licensing of businesses, occupations, and professions has been sustained in innumerable cases. While but few of these cases deal with a fee imposed upon attorneys by order of court the principle is the same as that which supports the imposition of a fee by the legislature for similar purposes.

(3) The petitioners further contend that if the act is put into force it will deny the benefit of the federal statute relating to the practice of the law in the federal courts to attorneys admitted to practice in this state. This argument seems to us to be farfetched. The federal courts fix their own rules of admission, disbarment, and discipline of attorneys. This state

has no power or authority either in the exercise of legislative or judicial power to modify or change those rules. If the United States district court chooses so to frame its rules as to make them dependent upon the action of the courts of the state of Wisconsin, that is a matter for the consideration of the United States district court and does not affect the validity of a state statute which in the very nature of things can neither confer nor take away a federal right.

It is also contended that the supreme court has only appellate jurisdiction (sec. 3, art. VII, Const.), and therefore cannot exercise the power of integrating the bar. This contention was fully considered in the case of *In re Appointment of Revisor* (1910), 141 Wis. 592, 124 N. W. 670, and there disposed of adversely to the petitioners' contention.

WHAT IS THE EFFECT OF THE ENACTMENT OF CHAPTER 315, LAWS OF 1943?

Ch. 315, Laws of 1943, provides, first, that there shall be an association to be known as the State Bar of Wisconsin composed of persons licensed to practice law in this state; second,—

"The supreme court by appropriate orders shall provide for the organization and government of the association and shall define the rights, obligations and conditions of membership therein, to the end that such association shall promote the public interest by maintaining high standards of conduct in the legal profession and by aiding in the efficient administration of justice."

It is not possible to classify accurately all the various governmental powers and to say that this power belongs exclusively to one department and that power belongs exclusively to another. As a matter of fact governmental functions have never been so classified. In the constitution itself some judicial power is conferred upon the legislature, notably the

right to prosecute and try impeachments. The executive in the discharge of his duties must necessarily interpret the law in order to administer it, and when a court through a receivership operates a great railway system, it exercises an administrative rather than a strictly judicial power.

From the beginning those who have been charged with the duty of exercising the various governmental powers have recognized that the constitution is primarily a set of principles and not of rules; that in the application of these principles there must be co-operation between the several departments in adapting the constitutional principles to the practical affairs of government in order to make the government workable. We dealt with the matter of the relation of the legislative and judicial departments of government under our constitution at some length in two cases, the first, *In re Cannon, supra,* the second, *Rules of Court Case* (1931), 204 Wis. 501, 236 N. W. 717.

Happily in the history of this state there have been few conflicts between the legislative and judicial departments of government regarding the exercise of the powers vested in them. The first of these was *In re Janitor of Supreme Court* (1874), 35 Wis. 410. In that case it appeared that the superintendent of public property attempted to remove the janitor of the supreme court and appoint another incumbent in his place. The court held that the superintendent had no such power and that it could not be conferred upon him, directed the reinstatement of the janitor and the inclusion of his name upon the pay roll. It appears that the controversy ended with the decision of the supreme court; the second was the clash between the legislature and the court with reference to the re-admission of a disbarred attorney to practice in the courts of the state. This case has already been referred to, *In re Cannon, supra.* In this connection, see also *In re Appointment of Revisor, supra.*

Throughout the history of the state this court in dealing with matters which lie in the zone between the legislative and judicial departments, has always exercised great care to avoid any controversy with the legislature. While the power to make procedural rules is undoubtedly a judicial power, and may be exercised by the court without legislative sanction, nevertheless the court over a long period of time accepted the procedural rules made by the legislature largely because they related to substantive as well as to procedural matters. The late Justice STEVENS while a member of this court was active in procuring the adoption of ch. 404, Laws of 1929, authorizing the court to make procedural rules and providing that all statutes relating to pleading, practice, and procedure should thereafter have the force and effect of rules of court. It was the opinion of those charged with the duty of acting that the rules of practice and procedure require revision and amendment from time to time, that the court was in a better position to act promptly and more familiar with the need for revision and amendment. In order that there might be no conflict between the two departments as to which had the right to exercise the power, ch. 404, Laws of 1929, was enacted. In the exercise of the rule-making power this court has exercised great caution to the end that no changes be made in the substantive law. So far no conflict has arisen and it is to be hoped that none will arise.

That there has been opportunity for conflict is apparent from the record. In 1849, the legislature enacted ch. 152, Laws of 1849, which provided:

"Whenever any person shall apply to the supreme, circuit or county court, to be admitted to practice therein as an attorney, and shall show satisfactorily to such court that he is a resident of the state, and is of good moral character, the judge, or judges thereof, shall grant to such applicant a license to practice in the said courts, respectively, in which he or they may preside."

This was undoubtedly an attempt by the legislature to exercise a power which resides solely in the judicial department. However, no conflict arose. In the matter of the admission to the bar of *Lavinia Goodell* (1875), 39 Wis. 232, 240, Chief Justice RYAN, speaking for the court, said:

"The legislature has, indeed, from time to time, assumed power to prescribe rules for the admission of attorneys to practice. When these have seemed reasonable and just, it has generally, we think, been the pleasure of the courts to act upon such statutes, in deference to the wishes of a co-ordinate branch of the government, without considering the question of power. We do not understand that the circuit courts generally yielded to the unwise and unseemly act of 1849, which assumed to force upon the courts as attorneys, any persons of good moral character, however unlearned or even illiterate; however disqualified, by nature, education or habit, for the important trusts of the profession. We learn from the clerk of this court that no application under that statute was ever made here. The good sense of the legislature has long since led to its repeal. And we have too much reliance on the judgment of the legislature to apprehend another such attempt to degrade the courts. The state suffers essentially by every such assault of one branch of the government upon another; and it is the duty of all the co-ordinate branches scrupulously to avoid even all seeming of such. If, unfortunately, such an attack upon the dignity of the courts should again be made, it will be time for them to inquire whether the rule of admission be within the legislative or the judicial power. But we will not anticipate such an unwise and unbecoming interference in what so peculiarly concerns the courts, whether the power to make it exists or not. In the meantime, it is a pleasure to defer to all reasonable statutes on the subject. And we will decide this motion on the present statutes, without passing on their binding force."

Miss Goodell was denied admission to the bar on the ground of sex, females not being included in the statutes relating to admission of candidates to the bar. As a matter of information, it may be stated that the statute was amended and Miss Goodell was admitted to the bar on April 22, 1879, Appendix

(1879), 48 Wis. 693, 694, 81 N. W. 551, the court again waiving its right to prescribe who shall be admitted as attorneys to practice in the courts of the state. The court said:

"We are satisfied that the applicant possesses all the requisite qualifications as to learning, ability and moral character to entitle her to admission, no objection existing thereto except that founded upon her sex alone. Under the circumstances, a majority think that objection must be disregarded." RYAN, C. J., dissented.

Ch. 152, Laws of 1849, became sec. 26, ch. 87, Stats. 1849, and by the 1858 revision became sec. 27, ch. 119, Stats. 1858, which was repealed by ch. 189, Laws of 1861. It is not necessary to set out ch. 189 in full. By its provisions to entitle a person to practice as an attorney he was required to be examined in open court or by examiners appointed by the court as to his learning in the law and ability to practice and was required to satisfy the judge that he possessed sufficient legal knowledge and ability to practice as an attorney and he was required to be a person of more than twenty-one years of age and of good moral character. Ch. 189, Laws of 1861, became secs. 31–35, ch. 119, Taylor's Stats. By revision of 1878, these became sec. 2586, Stats. 1878.

These sections have been amended from time to time and as amended are now embodied in sec. 256.28 of the statutes of 1941. From this record it appears that over a long period of years the court has deferred to the legislature in matters relating to the admission of persons to the bar. The court did not feel it necessary to assert its right to act in the premises but accepted and adopted the various acts of the legislature and by so doing avoided conflict with a co-ordinate branch of the government. It was only when as *In re Janitor of Supreme Court, supra,* and *In re Cannon, supra,* that the exercise of administrative and legislative power had so far invaded the judicial field as to embarrass the court and impair its proper functioning that the court felt compelled to maintain its integrity as a constitutional institution.

It is the primary function of the legislature to declare rules of conduct to govern the future action of the citizens of the state. The legislature does this in the discharge of its constitutional duty to promote the general welfare. Integration of the bar, while it concerns most intimately the courts and the bar, must necessarily affect the general welfare. What is true of the admission of attorneys to practice in the courts applies equally to the integration of the bar. It is because the public interest is necessarily involved in prescribing the conditions upon which persons shall be admitted to the practice of the law that courts generally have deferred to some extent to the legislative branch of the government in matters relating to the bar. In this field we have a fine example of the benefits derived from the co-operation and collaboration of two co-ordinate departments of the government. Without such co-operation and collaboration unseemly conflicts might easily arise because it is an area in which each department may within the exercise of its powers act with propriety.

It is quite obvious from a study of the history of the bar and the consideration of judicial decisions that the line of demarcation between the legislative field and the judicial field in matters relating to the bar is not a straight line or even a fixed one. Heretofore courts have dealt with attorneys as individuals. It has denied the right of persons to practice before it who are unworthy of the trust and confidence of clients and of those who are not properly qualified and learned in the law. Ch. 315, Laws of 1943, deals with the members of the bar in their aggregate or in a corporate capacity. To that extent it is an innovation in the law of this state. Inasmuch as the corporate body will include all of the persons admitted to practice before the court, the court must of necessity in the exercise of its judicial function, retain some measure of control over the organization, otherwise the court would be deprived of its unquestioned right to determine who shall be admitted to the practice of the law. We shall not attempt to delimit any further than is necessary for the purposes of this case, the respec-

tive powers of the legislature and the court in relation to the admission of attorneys to the bar and the regulation of their conduct.

It is obvious that whether the general welfare requires that the bar be treated as a corporate body is a matter for the consideration of the legislature. Inasmuch as the functioning of an integrated bar involves the exercise of regulatory control over its members, it directly affects the exercise of the power of the court over attorneys. So that the character and extent of the regulation is a matter of immediate concern to the court in the exercise of its functions.

While the court recognizes the power of the legislature to fix minimum standards of qualifications to be required of attorneys at law, it will determine for itself whether the qualifications so fixed invade the judicial field or embarrass the court in the discharge of its functions. It is no more within the power of the legislature to prescribe qualifications for attorneys which are too rigorous than it is to prescribe with finality those which are too low. In the promotion of the general welfare the legislature may prescribe required qualifications, but its acts are always subject to review by the court for the purpose of ascertaining whether they embarrass the administration of justice or invade the proper exercise of the judicial function.

Because of the familiarity of the court with rules of procedure, and with the conduct and qualifications of attorneys, it is in the public interest that the integration of the bar should be by order of court. Not only is the court more familiar with the matters to be dealt with but it is in regular session throughout the year. Necessary adjustments and amendments can be made with a minimum of effort and inconvenience. No doubt these considerations prompted the enactment of ch. 315, Laws of 1943.

William H. Spohn, Esq., in an able and helpful brief filed *amicus curiæ,* argues that the court should treat ch. 315, Laws of 1943, as a memorial invoking the power of the court to

integrate the bar for the reason that the court has the power to integrate the bar without the direction or prompting of the legislature and regardless of whether the legislature purports to confer any power in this regard upon the court.

A somewhat similar course has been followed in Nebraska, Montana, Oklahoma, Florida, and some other states.

To adopt this course would have the effect of reversing the position of this court as disclosed throughout the history of the state. It is difficult to state with exactness just what legal effect the court has given to acts of the legislature in this field. It is considered that the court has not treated them as a mere memorial, but on the other hand has attached much weight to them and by deferring to them has in practice given them a degree of finality. By the course which the court has pursued, and from which we are not disposed to depart, the court has recognized that the legislature in the exercise of its functions may deal with matters relating to the bar to a limited extent subject to the right of review by the court along the lines already indicated. For these reasons we do not feel at liberty to say now that an act of the legislature in this field is no more than a memorial.

While the legislature has no constitutional power to compel the court to act or, if it acts, to act in a particular way in the discharge of the judicial function, it may nevertheless with propriety, and in the exercise of its power and the discharge of its duty, declare itself upon questions relating to the general welfare which includes the integration of the bar. The court, as has been exemplified during the entire history of the state, will respect such declarations and, as already indicated, adopt them so far as they do not embarrass the court or impair its constitutional functions.

We do not regard the enactment of ch. 315, Laws of 1943, as an attempt by the legislature to invade the province of the court or to dictate to it, but as a declaration that the integration of the bar will promote the general welfare. If in thus expressing its determination the legislature has employed lan-

guage which might be construed as mandatory or coercive, we do not so regard it. It is as much the duty of the legislature as it is the duty of the court to stay within its constitutional field and we shall presume that it intended to do so in this case.

If put into effect, is the act invalid because it imposes burdens upon members of the bar with respect to their profession? While this proposition is stated in the brief of petitioners no authorities are cited in support of it. This proposition anticipates that the court will by order integrate the bar and as a part of the integration require the payment of an annual fee, inasmuch as that has been the practice in states where the bar has been integrated.

We think a decision of this question may well be postponed to a time when it has been more fully argued and a concrete case is before the court. Ch. 315, Laws of 1943, imposes no burden on members of the bar, hence cannot be invalid on that ground. At most it does no more than to sanction the imposition of a membership fee by the court.

We hold that ch. 315, Laws of 1943, was validly enacted and is a valid law. That being the case it becomes the duty of the court to determine how and when it shall act. Under the law and practice of the court as it exists at the present time the matter of the admission of candidates to the bar is satisfactorily provided for. By the same section of the statutes the matter of disbarment proceedings is provided for with sufficient appropriation to make the administration of the law effective. Under the administration of the present board of state bar commissioners all matters relating to misconduct of the members of the bar are promptly, thoroughly, and efficiently investigated, and such action taken as in the judgment of the board is necessary in the public interest. There is also upon the statute books an effective statute, sec. 256.30, relating to the unauthorized practice of the law. Undoubtedly there are areas not covered by these statutes which would be within the jurisdiction of an integrated bar.

The matter of the integration of the bar is the concern of every lawyer now practicing as well as of those who may be hereafter admitted. It is a matter of common knowledge that at the present time a large number of the lawyers are in the military and naval service of the United States. Many other members of the bar are giving a large part of their time and energy to matters directly connected with the prosecution of the war.

It is considered that the court ought not to proceed farther at the present time, and that the matter of integration should be postponed to a time after the lawyers in military service return home. Consideration of the scope of the order of integration and the activities of the bar pursuant thereto will be postponed to a time when a plan of integration is proposed. Whether the court should proceed by appointing a committee to propose a plan of integration and have that plan passed upon or whether a general question relating to the integration of the bar should be submitted, are matters that may properly await determination at a time when the conditions are such that the court may with propriety proceed in the matter. In due course the matter may be brought to the attention of the court or the court upon its own motion may proceed as it may then be advised.

*By the Court.*—It is considered and adjudged:

(1) That ch. 315, Laws of 1943, was validly enacted;

(2) That ch. 315, Laws of 1943, does not offend the constitution and is therefore a valid law;

(3) That the power to integrate the bar resides in the judicial and not in the legislative department of the government;

(4) That so far as the integration of the bar involves the matters affecting the general welfare, the legislature in the exercise of its powers may act subject to review by the court to determine whether the administration of justice is embarrassed or the constitutional powers of the court invaded;

(5) That in view of the fact that so many members of the bar are in the military and naval service of the United States

or engaged in promoting the war effort, the matter of integration should not be proceeded with at the present time.

FOWLER, J. (*dissenting*). I concur in the opinion of the court in so far as it holds that an act of the legislature duly certified as enacted cannot be defeated by evidence other than that appearing in or from the legislative journals and records. But for the reasons below briefly stated I am of opinion that the court should not, either of its own motion or pursuant to the instant act, integrate the bar of the state into an association or establish regulations for the conduct of the association's affairs.

In *In re Cannon,* 206 Wis. 374, 395, 240 N. W. 441, this court said:

"We admit that courts have no concern with the qualifications of lawyers except in so far as they are permitted to participate in the administration of the law in actions and proceedings in courts of law and equity. If the legislature desires to classify attorneys at law, we are free to say that courts would not be concerned with the qualifications of those permitted to perform legal services or to give legal advice which has nothing to do with the administration of the law in actions and proceedings in courts of law and equity. The legislature may establish such qualifications as it chooses for those who are permitted to act as conveyancers, examiners of title, organizers of corporations, or any other type of legal services which does not give them power to influence the course of justice as administered by the courts."

I had supposed that the above quotation expresses the declared and settled law of this state in respect of control of the bar, and I think we should not change that law to permit carrying out the legislative will to integrate the bar of the state as indicated by the instant act and can perceive no other valid reason for doing so. Under the law as above stated, the court may establish such qualifications for members of the bar as it deems appropriate to secure or further proper and efficient administration of justice by the courts in actions or proceedings at law or in equity instituted before them. It can go no

further of its own motion, and the legislature cannot empower it to go any further. And I am unable to perceive that an integrated bar or membership therein has any bearing whatever on the qualifications of a person to act as an attorney in the prosecution or defense of actions or proceedings in courts of law or equity.

If the legislature sees fit, in the exercise of its police power, as a means of protecting or furthering the public welfare, it may, perhaps, integrate the bar and establish such regulations for the conduct of the affairs of the association it creates as it deems necessary or appropriate; but if it may it would seem that it may, for like reason if there be any, organize the barbers and the plumbers and the machinists and the members of any other trade or class of workmen into a trade or labor union. But if the legislature may in the exercise of its police power do what the instant act directs the court to do, it may not, in my opinion, delegate the exercise of that power to this court, and the instant act attempts to do just that in telling the court to organize the bar of the state into an association and establish regulations for the conduct of its affairs.

The following opinion was filed January 18, 1944:

ROSENBERRY, C. J. (*on motion for rehearing*). Messrs. Holmes & Shuttleworth and Daniel H. Grady, Esq., who at the request of the court, consented to support the contention that ch. 315, Laws of 1943, is invalid, have filed a motion for a rehearing and a brief in support of the motion.

The character of this proceeding and the reasons why it was instituted are fully stated in *Goodland v. Zimmerman* (1943), 243 Wis. 459, 10 N. W. (2d) 180. The court there stated that in view of the fact that until an order of integration was entered, there would be no one qualified to commence an action in regard to the validity of ch. 315, Laws of 1943, it would proceed upon its own motion to institute such a proceeding to consider the validity of ch. 315, Laws of 1943. The court indicated that for that purpose it would, (1) retain a certified

copy of the record in the case of *Goodland v. Zimmerman;* (2) frame, upon its own initiative and with this record as a basis, such issues concerning the validity of the enactment and subject matter of the law as are deemed to be important; (3) invite such co-operation upon the part of those who oppose and those who defend the validity of this legislation as will insure adequate presentation of the matter to this court; and (4) in case of need, order a reference of any issues of fact considered to be material in determining this matter.

To effectuate its purpose, the court entered an order dated June 17, 1943, defining the questions which it wished to have discussed. At the request of the court Messrs. Holmes & Shuttleworth and Daniel H. Grady, Esq., consented to support the contention that the act is invalid, the attorney general upon request of the court continued to support the contention that the act is valid. For convenience those supporting the contention that the act is invalid were designated "petitioners" and those supporting the contention that the act is valid were designated "respondents." It was also indicated that the court would receive briefs *amici curiæ* from all parties who were interested in the proceeding. Briefs were filed by counsel on both sides of the question and both sides of the question were supported by briefs *amici curiæ.* The determination of the court was announced November 9, 1943.

It is abundantly clear from the foregoing that the proceeding while in form an adversary one was not so in substance. The proceeding took the form that it did so that there might be an orderly presentation and discussion of the questions involved. While the decision is in the form of a judgment, the effect of the judgment is limited and determined by the nature of the proceeding in which it is rendered. There were no parties to this proceeding. The record in the case of *Goodland v. Zimmerman, supra,* was returned to the circuit court with directions to dismiss the action.

The proceeding instituted by order of the court dated June 17, 1943, is for the purpose of enabling the court to inform itself as to the merits of the controversy and to determine what

course it will pursue in view of the enactment of ch. 315, Laws of 1943.

In his message to the legislature the governor said:

"It seems to me that the least we can and should do is to postpone legislation of this character until these young men return and are given an opportunity to express themselves on it."

In their brief·counsel for petitioners urge that because the legislature enacted ch. 315, Laws of 1943, over the veto of the governor, it thereby made it imperative for the court to proceed at once with the matter of integration,—in other words, that the court cannot accept ch. 315 in part but must accept it as a whole, including the implication that it directs the court to proceed promptly. The court must be governed in its action by the provisions of ch. 315 as enacted. The court has large discretionary power both as to the time and form of integration and the fact that the court takes the same view as the governor as to the propriety of postponing integration until such time as the men in the service return home in no way ignores a mandate of the legislature. The fact that the court is in accord rather than in disagreement with the governor as to the time of integration supports rather than impairs the soundness of its determination. The legislature and the governor were not primarily in disagreement as to the *time* of integration but as to desirability of integration at any time.

So far the rights of no parties have been affected except as the opinion of the court may be persuasive in the future consideration of the validity of reasonableness of any order of integration which may be hereafter entered. The rights of no citizen will be impaired in the slightest degree because the bar is not presently integrated.

Other matters discussed in briefs of counsel have been fully considered in the opinion filed and we see no reason for further consideration of these questions at this time.

*By the Court.*—Motion denied.